## MELVIN MESEDAHL v. ST. LUKE'S HOSPITAL ASSOCIATION OF DULUTH.[1]

April 5, 1935.

No. 30,083.

[1]Reported in 259 N. W. 819.

*Mitchell, Gillette, Nye & Harries, W. O. Bissonett,* and *E. W. MacPherran,* for appellant.

*Jenswold, Jenswold & Dahle,* for respondent.

HILTON, JUSTICE.

Action to recover damages for personal injuries sustained by Melvin Mesedahl, incompetent, alleged to have been caused by the negligence of the employes of the defendant hospital association. The case was tried to a court and a jury. A verdict for $24,648 was returned in favor of plaintiff. The trial court ordered a new trial unless plaintiff consented to a reduction of the verdict to $16,000. Plaintiff duly consented to the verdict as reduced. Defendant appeals from an order denying its motion for judgment notwithstanding the verdict or a new trial. The main question involved is whether the evidence, viewed in a light most favorable to plaintiff, supports a finding of negligence, and hence liability, on the part of defendant.

Plaintiff (36 years of age) received the injuries for which damages are here sought as a result of jumping out of a window in his room on the third floor of the hospital building while a patient therein for a few days' rest because of a nervous and depressed condition. He was seriously injured. The complaint charged that defendant carelessly, negligently, and unskillfully cared for, treated, and attended plaintiff while he was mentally deranged, delirious, and not in possession of his mental faculties, all of which was well known to defendant.

Defendant is a general hospital, operated and maintained for the care and treatment of medical, surgical, obstetrical, and pediatric cases. It did not take upon itself the curing of any disease, either by medicinal treatment or surgical operation; it was merely a place where physicians practicing their profession in Duluth and surrounding territory sent patients under their care; the hospital attendants performed routine services and carried out the instructions of the attending physician. Patients were not furnished with a nurse in constant attendance unless requested. What a patient may expect when entering a hospital such as defendant and what

the duties of such a hospital are toward the patient are stated in Mulliner v. Evangelischer Diakonniessenverein, 144 Minn. 392, 394, 175 N. W. 699, 700, as follows:

"When a patient enters such a hospital, knowing that the number of nurses is less than the number of patients, he may not expect constant attendance, but the patient is entitled to such reasonable attention as his safety may require. * * * If the patient is temporarily bereft of reason, and is known by the hospital authorities to be in danger of self-destruction, the authorities are in duty bound to use reasonable care to prevent such an act."

To the above may be added that if the actions of the patient are such that a reasonably prudent person should have under the circumstances anticipated an inclination on the part of the patient to attempt to escape or commit suicide, then reasonable care should have been exercised to prevent such act. St. Mary's Hospital v. Scanlon (C. C. A.) 71 F. (2d) 739; Harris v. Woman's Hospital (Com. Pl.) 14 N. Y. S. 881; Davis v. Springfield Hospital (Mo. App.) 196 S. W. 104; Davis v. Springfield Hospital, 204 Mo. App. 626, 218 S. W. 696; Breeze v. St. Louis & S. F. R. Co. 264 Mo. 258, 174 S. W. 409; Fetzer v. Aberdeen Clinic, 48 S. D. 308, 204 N. W. 364, 39 A. L. R. 1423. The trial court in instructing the jury correctly stated that it was the duty of defendant "to exercise such reasonable care for the protection of Melvin Mesedahl as his known condition or the condition which, in the exercise of reasonable care on its part, it should have known, may require."

With the above rules in mind, we proceed to consider the evidence relative to facts known to defendant before the patient jumped from the window. On February 15, 1931, Melvin Mcsedahl was left at defendant's hospital by his brother Halvor, who asked that he be admitted as a patient therein, apparently informing the person who took charge of Melvin that he was a patient of Dr. Richard Johnson. Halvor did not accompany his brother to the room assigned to him, nor did he state the nature of Melvin's ailment. Dr. Richard Johnson was notified by the hospital, and instructions as to the care and treatment of Melvin were given by

him. His directions, as recorded on the "doctors' order sheet," were:

"(1)  Ampule sodium amytol stat.
"(2)  Rx 87813—2 tsp. after each meal.
"(3)  Rx 87814 gtts. 15 3x before each meal.
"(4)  Strict bed rest, no visitors.
"(5)  Complete blood and urine.
"(6)  General diet."

These instructions were carried out; visitors were excluded from plaintiff's room, except the first evening, when his wife and brother visited him, and on the morning of the 17th, when his wife again called. No further instructions were given by Dr. Johnson nor by either of his associates who visited plaintiff while at the hospital as hereinafter noted. A history of the case was not taken by hospital attendants, nor was any information given them by anyone relative to plaintiff's illness, previous conditions, or actions.

Plaintiff was first assigned to a ward room on the second (surgical) floor. At 1:30 p. m. February 18, he was moved to a single room on the third (medical) floor. He should have been given such a room in the first instance, and would have been but for the lack of a vacant single room at that time. The latter room had but one window. Prior to plaintiff's removal thereto bars had been placed on the outside of the lower half of the window and in such a manner as to prevent the lowering of the upper half more than a few inches. The lower sill of the window was 29 inches from the floor; the lower half of the window was 44 inches high and the upper half 42 inches high. Plaintiff apparently broke the glass in the upper half and jumped out over the bars protecting the lower pane. Miss Medjo, a graduate nurse, in charge of the third floor, testified that the bars were placed on the window at the instructions of the supervisor and that such action was taken in all cases of nervous patients.

The nurses' record chart (an exhibit) indicates that plaintiff had a "good night" the 15th and also the 16th; that he had a "good day" on the 17th, and at 10 o'clock that night he was "sleeping." Then appears the following notation:

"A. M. 3 [18th] Awake—talks very peculiarly—Eyes have wild glare—restless—Very depressed—Seen by Dr. Cowen [an interne]."

The nurse who made that notation (Mrs. Birkeland) testified that plaintiff was very restless and unable to sleep; that he confided in her different things about his private life and wanted her to tell his wife that he had not been untrue to her and "talked things like that"; that he had a wild look in his eyes which she had not noticed before. She called the night supervisor and informed her what she had observed. Dr. Cowen then came to plaintiff's room, ordered a sedative, and it was given to him. When Mrs. Birkeland went off duty at seven o'clock that morning she reported the incident to the day supervisor and the day nurses. The nurses' record chart for the remainder of the 18th, here material, bears the following comment:

"A. M. 5 — Awake.
     6 — Fairly good night.
     8 — Does not seem so depressed * * *.
        Visited by Drs. Olson & West [Dr. Johnson's associates].
        Patient very depressed—Wants to make a confession.
"P. M. 1:30 Transferred to 332W.
        Bars put on window.
    4:00 Very depressed.
        Talks very little.
    4:30 Patient jumped from window over bars."

On the third floor, in addition to Miss Medjo and the supervisor, were four student nurses. No nurse remained in constant attendance. Miss Medjo was in and out of the room every 30 or 40 minutes, and it is inferable from the record that the student nurses looked in from time to time. No restraints to confine plaintiff to his bed were used. Miss Medjo testified that sometimes she talked to him; at other times merely looked in to see if he was all right; that at all times he was lying down in bed except once. That time he was sitting on the edge of the bed, his face in his hands,

his feet over the edge of the bed but not touching the floor. She asked him to lie down and rest, and he did so without saying anything. The last time she visited him before the accident, which occurred at 4:30 p. m., was shortly before four o'clock. At that time he was lying quietly in bed, "looking around, looking at the ceiling." He did not talk to her. Shortly before four o'clock Miss Hanson, a student nurse, in passing by the open door to plaintiff's room, observed him sitting on the edge of the bed, "his feet dangling, not touching the floor." She asked him to get into bed and lie down, which he did without saying anything. At about four o'clock another student nurse, Miss Appelby, visited plaintiff's room and gave him a liquid medication in a glass. He raised up on his elbow, took the glass from her, drank the contents thereof, and lay down again. Miss Medjo testified that shortly after her last visit to the room she heard a loud noise, rushed to a room where she had a pneumonia patient who was irrational, and found that the noise did not come from there. A visitor in a near-by room came out and told her that a man had jumped out of the window in the next room. She then went to plaintiff's room and saw the bed empty, the upper pane of the window broken, and the curtain rod down. The rest of the room, including the lower half of the window and the bars thereon, was not disturbed.

An interne made a physical examination of plaintiff on the 18th, apparently while he was still in the ward room on the second floor. In addition to the report on plaintiff's physical condition, the interne made the following comment:

"Patient is a white male of stated age; well developed; well nourished, walking about. Appears to be much depressed, is very restless; is walking about ward. Asking for folks to be sent for & asking that they be told to pray for him. Seems to think that he has done something wrong & wants to confess. * * *"

We are of the opinion that the known facts were not such as to charge the hospital authorities with negligence in not anticipating that plaintiff was contemplating escape or self-destruction. A reasonably prudent general hospital nurse or interne could not have

expected that plaintiff under the circumstances would suddenly jump out of bed, step up on the window sill, climb over the large lower half of the window, break the glass in the upper half, and throw himself out therefrom. Such act was unforeseeable to a mind not specially trained in cases of mental disorder. Dr. Julius Johnson, an expert in nervous and mental diseases, called on behalf of plaintiff, testified that a few days before the trial, when plaintiff was much improved mentally, he questioned plaintiff in an effort to determine his mental condition. He stated that plaintiff described to him how he went out of the window; that it was "decided very quickly. It took him just a matter of a few moments to decide what to do." There were no overt acts on the part of plaintiff such as would warn the hospital attendants of a tendency on his part to do himself harm. If his apparent attempts to get out of bed can be attributed to anything more than restlessness, his ready compliance with the admonitions of the nurses indicates that he was amenable to reason shortly before the accident.

As to plaintiff's condition, the attending physicians knew as much as, or more than, did the hospital authorities. They gave no instructions to apply restraints, nor did they direct that the bars be put on the window. The nurses and internes at a general hospital are charged with the duty of carrying out the instructions of the attending physician, except in cases of emergency. Such of necessity must be the rule. When a patient enters a hospital upon the advice of a physician chosen by him, he naturally desires and expects, and has the right to expect, that the instructions of his physician will be complied with. He relies upon the skill of his own doctor; he knows nothing of the ability of the internes and nurses. Where an emergency arises it is of course incumbent upon the nurses or internes to exercise their own judgment until report can be made to and instructions received from the attending physician. Such, the evidence shows, was the practice at defendant's hospital. There is nothing in the evidence indicating an emergency. If the actions and appearance of plaintiff early on the morning of the 18th were such as to suggest that emergency measures be taken, the nurse then in charge promptly did so. She called the super-

visor, and a sedative was promptly given, after which the patient apparently slept until five a. m., and at eight a. m. appeared to be "not so depressed." The associates of the attending physician visited plaintiff after the notation had been made upon the chart relative to the wild glare in plaintiff's eyes, his restlessness, etc. The evidence shows that charts of this kind are kept for the information of the doctors, and presumably they read what had been entered thereon. The attending physician was not permitted to testify because of his statutory incompetency, successfully urged by plaintiff. However, hospital records bearing notations made by him and by his associate Dr. Olson were introduced by plaintiff and received in evidence. On the "progress sheet," under date of February 15 there is a notation made by Dr. Richard Johnson as follows:

"Patient seen in the office [doctor's office] moderate depression and quite restless, wanted to come to hospital. He had a similar spell one year ago."

Below that is a notation dated February 18 by Dr. Olson:

"Pt. 'wishes to confess.' Has forged a check on his brother gone to Canada; to Superior in 'sporting district'; and other things 'if I want to ask about them.' "

Certainly, when experienced doctors, in charge of the case, with knowledge of all that had occurred, did not consider restraints necessary, it was not for the nurses or internes to take it upon themselves to apply restraints upon a patient who had not displayed a proneness to do himself or anyone else injury. It is conceivable that application of restraints upon the person of one who is already nervous may induce an overwhelming desire to fight against the bonds, thereby doing himself more harm than good. The advisability of applying restraints should rest in the discretion of the attending physician. With respect of the duty of hospital attendants to obey instructions of the physician in charge of the patient, it is stated in Byrd v. Marion General Hospital, 202 N. C. 337, 341, 162 S. E. 738, 740:

"The great weight of authority, however, establishes the principle that nurses, in the discharge of their duties, must obey and diligently execute the orders of the physician or surgeon in charge of the patient, unless, of course, such order was so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order or performance of such direction. Certainly, if a physician or surgeon should order a nurse to stick fire to a patient, no nurse would be protected from liability for damages for undertaking to carry out the orders of the physician. The law contemplates that the physician is solely responsible for the diagnosis and treatment of his patient. Nurses are not supposed to be experts in the technique of diagnosis or the mechanics of treatment."

Cases cited in the fore part of this opinion support the views we have expressed. The facts in some of those cases were not as favorable to the defendants therein as are those in the instant case. In none of them had bars been placed upon the window from which the patient jumped. In some of them the circumstances were such that had they been present here it may be that our conclusion would be different. Each case, however, must be decided upon its own facts, under general applicable principles of law. Nothing occurred here before the accident that would suggest to the ordinary prudent person under like circumstances that plaintiff was suffering from suicidal mania.

Dr. Julius Johnson, the expert called on behalf of plaintiff, testified that he was suffering from "manic depressive insanity." His testimony was given after hearing that of plaintiff's relatives. Plaintiff's wife testified that plaintiff had confided in her an intention "to do away with himself." She related other circumstances indicative of a proneness to suicide, as did also plaintiff's brothers. There was testimony that earlier on the day he was taken to the hospital plaintiff had fainted in church, after which he was taken to Dr. Richard Johnson's office. On the way from the doctor's office to the hospital he leaped from the car and ran to a policeman on the curb, stating to him that he wished to confess. Dr. Julius Johnson, the expert, testified:

"As I understand it, he [plaintiff] had talked of suicide before. He had run out of the car and talked to the policeman for the purpose of confession. He had these ideas in church there that someone was doing something, which was a false conception probably, and in my opinion there was enough clue there to form an opinion that this man was a prone case for protection, that needed protection."

On cross-examination he stated that his opinion that protection was necessary was based upon his examination of plaintiff made the day before the trial and upon the previous testimony in the case. The opinion of the expert, based as it is upon facts not in the possession of the hospital authorities, is of no probative value upon the issue of defendant's negligence unless defendant was charged with the duty of ascertaining the history of plaintiff's case at the time of his entry. Looking backward after an event has taken place and after all the facts leading up to it are disclosed, the cause thereof becomes much more apparent than is the likelihood of its occurring when looking forward before the event happens. After all the evidence was in, it needed not an expert to say that plaintiff must have been suffering from some mental delusion impelling physical violence. And though an expert of Dr. Julius Johnson's diagnostic skill may have, upon the facts known to the hospital nurses and internes, concluded that plaintiff might be contemplating self-injury, it does not place negligence upon ordinary general hospital attendants for failing to reach a like conclusion.

We do not agree with respondent that the employes of defendant in the exercise of reasonable care should have ascertained plaintiff's condition previous to his entry into the hospital. To do so would have required interviewing relatives. Plaintiff was left at the hospital by his brother without a word of information as to his ailment. The instructions received from his doctor indicated nothing more than that plaintiff was in need of rest. He was under Dr. Johnson's care, who presumably was aware of his patient's condition. Dr. Johnson was not an employe of the defendant as

far as the record shows. His negligence, if any there was, cannot be imputed to defendant. If defendant was a hospital maintained and operated for the purpose of treating and curing diseases, physical and mental, and having its own staff of doctors and specialists for that purpose, it probably would be its duty to ascertain all it could concerning an entering patient's previous history, especially so with respect to hospitals specializing in the cure of mental disorders. In the instant case plaintiff's relatives must be charged with knowing the nature of the services rendered by defendant; that no one would be in constant attendance; that defendant did not specialize in mental cases generally and knew nothing of plaintiff's case particularly. It would be a harsh rule indeed that would charge the authorities of a general hospital to go in search of the relatives of every patient entering it under the care of a physician of his own or his relatives' selection and to ascertain, independently of the attending physician, the nature of the patient's ailment and then to exercise their own judgment as to treatment required.

Many cases cited by respondent involve hospitals specializing in and equipped for the treatment of mental cases and are not helpful. As before indicated, a different rule applies. Other cases cited are clearly distinguishable upon the facts. We are forced to the conclusion that there should be judgment notwithstanding the verdict. It is so ordered.

Reversed.