No. 13576

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

KATHERINE W. HUNSAKER,

              Plaintiff and Appellant,

      -vs-

BOZEMAN DEACONESS FOUNDATION,

              Defendant and Respondent.

Appeal from: District Court of the Eighteenth Judicial
             District,
             Honorable LeRoy L. McKinnon, Judge presiding.

Counsel of Record:

      For Appellant:

            Acher and Swanberg, Helena, Montana
            Arthur P. Acher argued, Helena, Montana

      For Respondent:

            Anderson, Symmes, Forbes, Peete & Brown,
             Billings, Montana
            Rockwood Brown argued, Billings, Montana
            Berg, Angel, Andriolo & Morgan, Bozeman,
             Montana
            Charles F. Angel argued, Bozeman, Montana
            Robert Cummins argued, Helena, Montana

                              Submitted:  January 13, 1978

                                Decided:

Filed:

_____
                          Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Plaintiffs appeal from a jury verdict and judgment entered in the District Court, Gallatin County, favoring defendants in an action for personal injuries.

This case involves three cases consolidated and tried together. Elzarus L. Hunsaker, one of the plaintiffs (now deceased), filed an action against the Bozeman Deaconess Foundation, operator of the Bozeman Deaconess Hospital, for personal injuries sustained because of alleged negligence in caring for him as a patient. Hunsaker also filed a separate suit against Drs. E. E. Bertagnolli and William S. Prunty, the treating physicians. In addition, Katherine W. Hunsaker, plaintiff's wife, filed a separate action against Bozeman Deaconess Hospital for its negligence in caring for her husband. Her claim for damages was a derivative action for loss of consortium. Each of the actions for negligence was based on the same incident.

Defendant William S. Prunty moved to consolidate all three actions under Rule 42, Mont.R.Civ.P. Bozeman Deaconess also agreed to the consolidation. Over plaintiffs' objections, the court ordered consolidation.

The essential claim of plaintiff Elzarus Hunsaker is that the defendant physicians were negligent in diagnosing his condition and caring for him and that the hospital was negligent in caring for him. As a result of this, plaintiff received severe personal injuries when he ran out of a hospital security room, ran down the hall, and jumped through the solarium window, falling twenty feet to the ground below.

The facts giving rise to these claims follow.  On November 8, 1969, Hunsaker, a rancher, was admitted to Bozeman Deaconess Hospital by his physician, Dr. E. E. Bertagnolli.  Hunsaker had a previous history of heart problems.  The diagnosis surrounding his admission was for emotional strain apparently stemming from family problems, and possible recurring heart problems.  After admission, Hunsaker was nervous, hallucinated, and had at least one seizure.

On November 9, Hunsaker told an attendant he might be able to sleep if he didn't jump out the window.  On November 10, Dr. Bertagnolli called Dr. Prunty, a psychiatrist, into the case.  On November 12, Dr. Prunty had Hunsaker transferred from his first floor room to a security room on the second floor.  This room was used for temporary observation and control of patients with mental problems, and for drying out alcoholics.  All the furniture was moved out of the room with the exception of the bed.  The room had a screened window and a double door entry with locks.

The first night Hunsaker was in the room, a male orderly remained with him until midnight.  Written orders from the physicians were to "lock door, if unattended."  The orderly testified that while he remained with Hunsaker, the door remained locked and that if he wanted to get out, he had to knock on the window and the night supervisor would come with her key and unlock the door.  The night supervisor directly contradicted this testimony.

At midnight, a sitter, Mrs. Bisland, relieved the orderly.  She was not a nurse but was an experienced aide.  She was sixty years of age and approximately two hundred pounds.  Hunsaker was fifty-four years of age, powerfully built, and

-3-

approximately two hundred pounds. During the night, Hunsaker remained awake, occasionally hallucinated and talked and walked around the room. Each time he would do this, the sitter talked him into returning to bed.

In the early morning hours of November 13, at approximately 5:20 a.m., another patient entered Hunsaker's room. (There is a dispute whether this patient had also wandered into the room a little earlier on the same morning.) Hunsaker mistakenly believed the patient was his sister, and insisted on talking to her. The sitter was able to remove the other patient from the room and she talked Hunsaker into returning to bed. Suddenly, Hunsaker jumped out of bed, forced himself past the sitter, ran out of the room and down the hallway to a solarium at the end of the hall. There he jumped through the solarium windows, falling twenty feet to the ground below, and receiving serious and permanent injuries. Some time thereafter the instant actions were filed against the hospital and physicians.

Plaintiff Hunsaker generally alleged he was in a condition of irrationality and mental incapacity at the time he jumped through the window and that the hospital had failed to take proper care of him, knowing he was in that condition. He alleged the hospital failed to keep qualified personnel, and failed to keep an adequate staff of nurses, orderlies and hospital personnel. He further alleged the hospital failed to keep Hunsaker in a section of a hospital separated from other patients, and failed to provide facilities which would prevent an escape while in a condition of mental derangement and incapacity. He also alleged breaches of hospital standards and state licensing laws.

-4-

Plaintiff's allegation of negligence against defendant physicians was that they had failed to properly diagnose his condition and consequently failed to properly care for him.

All defendants filed general denials of negligence, but filed no special defenses as to Alzarus Hunsaker. They did allege however, apparently as contributory negligence on the part of Katherine Hunsaker, that she failed to give them correct information as to her husband's prior habits concerning the use of alcohol and prescription drugs.

Plaintiffs raise a host of errors which they contend entitle them to a new trial. Generally, they fall into the following categories: (1) the court improperly allowed each defendant to have four peremptory challenges while confining the plaintiffs to four peremptory challenges between them; (2) the court improperly refused opinion testimony from plaintiffs' expert witnesses; (3) other errors were made in admitting evidence; and (4) several errors were made in instructing the jury, primarily with regard to the doctrine of res ipsa loquitur and on the question of expert medical testimony.

Plaintiffs first contend the District Court improperly granted each of the defendants four peremptory challenges because they did not in fact have "hostile" interests as required by statute. Section 93-5010, R.C.M. 1947, provides in relevant part: " . . . Each party is entitled to four peremptory challenges."

This court has long recognized the inherent problems in presiding over jury trials where there are multiple parties. Recognizing the potential unfairness of uneven peremptory challenges, this Court held that "each party" in terms of the statute, means "each side", unless the position of co-plaintiffs or co-defendants is shown to be "hostile" to each other. Mullery v. Great Northern Ry. Co. (1915), 50 Mont. 408, 148 P. 323; Leary v. Kelly Pipe Co. (1976), 169 Mont. 511, 549 P. 2d 813. As a practical matter plaintiffs rarely have "hostile" interests to each other, and therefore the question is usually one of how many peremptory challanges co-defendants shall have. This Court has never set forth any rules as to what co-defendants must present to the trial court to prove they are "hostile" to each other. The closest we have come is we have indicated in Mullery and Leary that "hostility" can be shown by the "pleadings, representations, or evidence."

In Mullery, in determining that the co-defendants must prove they are "hostile" to each other, we stated:

> ". . . Whether such hostility must appear on the face of the pleadings, or whether it may be shown in some other way at the time the jury is selected, we need not determine because no such hostility was ever made to appear in any way in the case at bar. . . As between them there was not, by pleading, representation, or evidence, any conflict of interest disclosed or any issue of any sort. . ." 148 P. at 326.

Accordingly, we concluded the District Court was correct in allowing multiple defendants to have a total of four peremptory challenges. It is clear however, this Court did examine the case to determine if there was any hostility and determined there was none.

-6-

In *Leary*, the District Court granted multiple defendants eight peremptory challenges, as opposed to the plaintiff's four, and we upheld the District Court on the ground the plaintiff had shown no prejudice. In holding that *Leary* must show prejudice before he would be entitled to a reversal, we stated:

> ". . . In the instant case Leary has advanced
> no fact which indicates material injury, nor
> has he attempted to show that objectionable
> jurors sat on the case. Thus the first issue
> must be resolved in favor of defendants."
> 169 Mont. at 516.

We did not, however, discuss the facts as to how the District Court reached his decision--that is, whether there was in fact hostility between the co-defendants.

The very nature of the problem makes appellate review extremely difficult. Is it sufficient to place the burden on either party to show he has been prejudiced by the trial court's ruling on the question of peremptory challenges? Indeed, in most instances, proving prejudice, (normally, that a juror who sat on the case was prejudiced against one of the other parties), and if the court had ruled properly the result would most probably have been different. In the ordinary case, proving prejudice may be an impossible burden. As a result, if at the appellate level we concentrate on the actual conduct of a juror as opposed to the correctness of the trial court's ruling, the decision of the trial court is virtually unreviewable. The correctness of the trial court's decision is effectively eliminated from our consideration. Rather, our attention is focused on the conduct of the jury, which in most cases we are in no position to determine.

The problems are magnified by the procedure that usually takes place. Frequently there is no record or only a scanty record of what happened in the trial court. The usual situation

-7-

is the parties do not notify the court and opposing parties in advance of trial that each co-defendant, for example, will ask for four peremptory challenges. Perhaps in some situations the parties do not disclose their intentions until the time has come to start exercising the peremptory challenges. Suddenly the court and plaintiff is confronted with defense motions asking to have four peremptory challenges for each defendant. In many situations the trial court will be taken by surprise and will not have sufficient time to reflect on whether the co-defendants are in fact "hostile". The opposing party, moreover, may also be caught by surprise and is not prepared to answer the contentions of the co-defendants. The court is compelled to rule without having the benefit of a thorough briefing by the parties to the action. The result is that when a case comes to us on appeal, we have no basis to determine if, at the time the trial court made its ruling, it was correct. We are compelled rather, to look at the entire record in hindsight to determine if the parties were in fact "hostile" during the course of the trial. Moreover, even if we agreed with an appellant that the District Court ruling was in error, we would not reverse unless the appellant could also prove actual prejudice. This is hardly a standard of review designed to get at the root of the problem. The focus should be on whether the ruling was correct at the time it was made.

What happened in this case is illustrative of the general problem. Before the commencement of the trial there was no indication that plaintiffs or defendants would be asking each to have four peremptory challenges. Just as questioning of the jurors was about to start, the trial court asked the parties if they had agreed on a challenge procedure. If the court had

not done this it does not appear the parties would have brought the matter to the court's attention until the time came to actually start exercising the peremptory challenges. There is a two-page discussion on the record where the parties seek to make their positions known to the court. No law was provided to the court and the pleadings or other factors which may show "hostility" were not discussed. Defendants generally took the position that because each could be subject to a separate judgment that each was entitled to four peremptory challenges. Without discussing the pleadings or proposed evidence that might show "hostility" the trial court set forth no reasons for its ruling and simply concluded: "four peremptories to the plaintiff and four to each defendant."

We thus have a situation under Leary, where the plaintiffs have a burden to prove not that the District Court was right, but that the plaintiffs were prejudiced by the ruling. As previously indicated, it is virtually impossible to prove prejudice in such a situation. Certainly an adverse result should not be the governing standard. The result is that there is an uncontrolled discretion in the District Court to rule any way it desires with the losing party having the laboring oar to show that it was actually prejudiced. In this context, the correctness of the District Court's ruling evaporates and the issue on appeal becomes one of proving that the jury was somehow prejudiced against one of the parties and thereby precluded a fair trial. We believe the correctness of the District Court's decision should be a factor in our review.

In the present case, because the record at the time the court entered its ruling, is devoid of evidence showing the parties were "hostile", we are necessarily compelled to take a hindsight approach to the question and make our determination from the trial record.

The defense theories of the hospital and defendant physicians meshed like the finest gearshift mechanism. The hospital asserted it followed and had the duty to follow the physicians' orders in the absence of an emergency. The defendant physicians assert that they gave proper orders. The physicians also testified that no emergency existed and therefore the hospital properly followed their orders and was not required to take independent action to protect Hunsaker from himself. The physicians testified the hospital provided the best possible care under the circumstances, and there is no indication that hospital witnesses found the slightest degree of fault with the physicians' care of the patient.

Jury instructions were synchronized between the hospital and defendant physicians. Neither the hospital nor the physicians objected to any instruction offered by the other. Defendants did not try to pass the blame off to each other. It is true each defendant had his own interest to protect in that each could have suffered an adverse jury verdict--but there is no showing that their interests were hostile to each other.

In considering the number of peremptory challenges allowed to each side, the trial court must, of necessity, make its best judgment based on the facts that are presented to it before its ruling. It is necessary it have certain leeway, for even in the days of discovery, the twists and turns of a trial are unpredictable. If there is a sound basis for its ruling in the record and the reasons for the ruling are set forth in the record, the ruling should not be reversed on appeal even though it may have developed during the course of the trial that the court should have made a different ruling. A hindsight approach to review in this circumstance is not appropriate. On the other hand, if there is not a sound basis in the record

at the time of the ruling, and if the reasons for the ruling are not set forth, we cannot say the parties have had the benefit of the trial court's best judgment. The discretion exercised under these circumstances is no discretion at all.

While we cannot evaluate the effect of error in granting additional peremptory challenges to one side or refusing to grant additional peremptory challenges to one side, we cannot blind ourselves to the advantages conferred on one side by having additional peremptory challenges. Where is the trial lawyer who would not like to have twelve peremptory challenges to his opponent's four? It is precisely for this reason that the correctness of the trial court's decision must be part of the review process on appeal.

We are in an era where multi-party litigation is proliferating. The issue involving the number of peremptory challenges allowed each side is likely to be a continuing one--because each case must, of necessity, be resolved on an individual basis. It is imperative in reviewing the proceedings of the trial court that this Court have a complete record with relation to the motions made and the rulings on the number of peremptory challenges to be allowed each side. It is incumbent, therefore, upon trial counsel and the District Court to make a proper record.

The existing civil procedure rules, particularly the pretrial conference as provided for in Rule 16, Mont.R.Civ.P., are ideally suited for the resolution of issues relating to the number of peremptory challenges to be allowed each side. Rule 16 provides in part:

> "In any action, the court may in its discretion direct the attorneys for the parties to appear before it for a conference to consider:
>
> ". . .
>
> "(6) Such other matters as may aid in the disposition of the action."

-11-

The District Courts should seriously consider the use of the pretrial conference as the best procedure to be used in resolving questions such as the number of peremptory challenges to be allowed each side. If for some rare reason the District Court holds no pretrial conference, the question of peremptory challenges should be raised by appropriate written motion filed before the commencement of jury selection, and it should set forth all facts and references tending to support his claim of hostility. In any case, the opposing party or parties should be given adequate time to respond to the claims of hostility.

The trial court should, as a bare minimum, rule on the peremptory challenge issue before the questioning of jurors begins. To afford a basis for review, it should expressly set forth in the record the reasons for its ruling and the facts on which it relies in making its decision.

In a related peremptory challenge issue, Mrs. Hunsaker asserts she should have been given four peremptory challenges because of her own action against the hospital. We find no error. Her cause of action is one for loss of consortium, and is a derivative in nature. The success of her claim depended on the success of her husband's claim for personal injuries against the hospital. The nature of the lawsuits precludes any claim of hostility existing between Mr. and Mrs. Hunsaker.

Plaintiffs raise several issues concerning the trial court's refusal to allow plaintiffs' expert witnesses to testify to the standards of care required of Bozeman Deaconess Hospital and the diagnosis and care given to Hunsaker by the defendant physicians. We first will set forth the facts giving rise to these issues.

-12-

One of the main themes of Hunsaker's case was that
he was suffering from toxic psychosis and defendants failed
to properly diagnose this condition and take adequate steps
to protect Hunsaker from himself.  Dr. Townsend, one of
plaintiffs' experts, testified that toxic psychosis could
be caused by medications, or substances administered to the
patient which cause metabolic derangement of the brain which
thus influences behavioral changes.  The same psychosis could
be caused by withdrawal of certain drugs or substances from
the patient.  Plaintiffs contended that when Hunsaker exhibited
the symptoms of toxic psychosis the defendant physician did
not take the required steps to assure Hunsaker would not jump
out the window.  Defendant physicians, on the other hand,
deny he was suffering from toxic psychosis, and contend he
was admitted to the hospital for emotional problems relating
to family difficulties and for possible recurring heart
problems.

Dr. Bayles, one of plaintiffs' experts, testified that
he had treated Hunsaker in times past, and his examination
of the hospital and medical records after Hunsaker's admission
to the hospital revealed Hunsaker was suffering from toxic
psychosis and should have been treated and cared for as
suffering from such.  Also introduced in evidence were standards
for hospital accreditation of the joint commission on
accreditation of hospitals, the Montana licensing law and
standards, and the rules and regulations of the medical staff
of Bozeman Deaconess Hospital.  One of the issues was whether
the hospital failed to follow the standards in caring for
Hunsaker.  Plaintiffs set forth a hypothetical set of facts
to Dr. Bayles, but the District Court sustained a general
objection when plaintiffs asked the question based on those
facts.  The question was rephrased, and the witness was asked:

"Q. Having in mind the record that I just mentioned, would you tell us in what respects, in your opinion, the standards of good hospital practice in effect in Bozeman in November in 1969 were not adhered to?"

In sustaining an objection the court stated:

". . . Well, I am going to sustain the objection on this one . . . I think the Jury can determine whether the rules are applied as well as any other person can. As long as they have the rules and the facts."

Plaintiffs also questioned Dr. Bayles on the issue of whether the door to Hunsaker's hospital security room should have been locked at all times, even though a sitter was in the room with him. Plaintiffs contended a locked door would have prevented other patients from wandering into the security room and disturbing Hunsaker, and ultimately, that a locked door would have prevented Hunsaker from leaving his room and jumping out the window. The physicians' orders to the nurses stated: "Lock door if patient unattended."

Dr. Bayles was asked if it was sound medical practice to "recommend that the door be opened or closed even though a sitter is in attendance?" The court sustained an objection that the answer would invade the province of the jury. Two nurses testified their interpretation of the order meant the door would be locked if Hunsaker was by himself, but if someone was attending him, the door would be open. On the other hand, the court permitted the defendants to put in evidence that the order was a proper one, and that it was sound medical practice under the circumstances of this case, to leave the door open if someone was attending Hunsaker at the time. While testifying as an expert witness for the hospital, a psychiatrist concluded the order was a proper one and that it was sound medical practice to leave the door open as long as Hunsaker was being attended. The end result is the jury heard only the defense side of this issue. The prejudice is clear.

-14-

Another issue during the course of Dr. Bayles' testimony was whether Hunsaker's symptoms of the evening before he jumped out the window were such that the nurses or other hospital personnel should have called the attending physicians and alerted them to Hunsaker's changed condition. Dr. Bayles was asked if the symptoms were a clear warning to the hospital staff to call the treating physicians. The court sustained an objection that it would invade the province of the jury. In the defendants' case-in-chief, however, the court permitted, over plaintiffs' objections, both defendant physicians to testify that Hunsaker's symptoms were not sufficient to require the nurses or hospital personnel to notify the treating physicians. Again, the prejudice is clear.

A recurring theme of defendant Prunty's objections was that Dr. Bayles could not testify as to Dr. Prunty's diagnosis and treatment of Hunsaker because Dr. Prunty was a specialist (psychiatrist) and Dr. Bayles was not. In Baerman v. Reisinger (D.C. Cir. 1966), 363 F.2d 309, the trial judge refused to allow a general practitioner testify on behalf of a plaintiff in an action filed against a cardiologist. In reversing, the court concluded:

> "It is settled law that '[a] physician is not incompetent to testify as an expert merely because he is not a specialist in the particular field of which he speaks.'"

The court reasoned the training and specialization of the witness goes to the weight of the evidence rather than to the admissibility.

Other courts have also adopted the rule allowing a general practitioner to testify in a negligence suit against a specialist. The objection that one is not a specialist, goes to the weight of the testimony rather than to one's

-15-

competency to testify. Harold v. Radman (Maryland 1976), 31 Md.App. 184, 355 A.2d 477; Wolfinger v. Frey (Maryland 1960), 223 Md. 184, 162 A.2d 745; Frost v. Mayo Clinic (1969), 304 F.Supp. 285; Barnes v. St. Francis Hospital & School of Nursing, Inc. (1976), 211 Kan. 315, 507 P.2d 288; Benzmiller v. Swanson (N.D. 1962), 117 N.W. 2d 281. Accordingly, we conclude that Dr. Bayles was qualified to testify even though he was not a psychiatrist.

We turn next to plaintiffs' contention that Dr. Bayles should have been permitted to explain how the hospital rules operated and whether the hospital violated the rules. It is rare in a case involving a medical question that experts are not called by both plaintiffs and defendants to explain the techniques, practices and intricacies involved in the case. Except perhaps in the most blatant case, the jury would become helplessly mired without the aid of expert medical testimony. A physician would normally be in the best position to explain how the rules operate and whether they were properly followed in a particular case. Undoubtedly, this would be of great benefit to the jury.

In the early case of State v. Cassill et al. (1924), 70 Mont. 433, 227 P. 49, this Court held that witnesses who were qualified as experts in accounting and bookkeeping could explain the meaning of various entries because the information would be helpful to the jury. Explaining the application of the hospital rules to the facts of this case would be equally as helpful to the jury. Since Cassill, this Court has upheld the use of expert testimony in many factual situations. Indeed, this Court has created many exceptions to the rule prohibiting opinion testimony because we have recognized the inherent need for expert opinions if the factfinding process is going

-16-

to be realistic and meaningful. Note, 37 Mont.L.Rev. 267 (1976). The new Mont.R.Evid., which will apply to this case upon retrial, are explicit in allowing opinion evidence. Rules 701 through 705, Mont.R.Evid.

We have long held moreover, that where there is a need for expert testimony, and where the expert is qualified, the opinion, in the form of a conclusion ". . . may be stated by a qualified expert, even though the conclusion is a statement of an ultimate fact to be found by the jury." Kelley v. John R. Daily Co. (1919), 56 Mont. 63, 181 P. 326; Copenhaver et al. v. Northern Pac. Ry. Co. (1911), 42 Mont. 453, 113 P. 467.

Under the new rules the only limitation on the expert is that he be qualified by reason of "knowledge, skill, experience, training or education . . ." (Rule 702.) The range of possible testimony is all "scientific, technical, or other specialized knowledge" which would aid the trier of fact. (Rule 702.) Even the time honored hypothetical question is no longer required as a condition to giving expert testimony. (Rule 705.) And, an expert can give his opinion on the ultimate issue in the case. (Rule 704.) The means by which any weakness in the basis of the opinion should be revealed is through cross-examination. (Rule 705.)

The trial court should have permitted Dr. Bayles to explain his interpretation and application of the rules to the facts of the case. If Dr. Bayles was in error, any weaknesses in his opinion would have been exposed by cross-examination. Moreover, the defendant physicians, in their own testimony, would have been quick to reveal his errors.

We conclude also the court improperly restricted Dr. Bayles' opinions as to whether the security room should have

been locked while someone was attending Hunsaker and whether Hunsaker's physical symptoms on the evening before, demanded that the nurses contact the attending physicians to inform them of Hunsaker's changed condition. These errors were compounded because the defendants were permitted to introduce evidence on both of these questions. The jury was entitled to know what plaintiffs' witnesses had to say on the same subjects.

Plaintiffs also contend Dr. Townsend should have been permitted to testify to the standards of care in Bozeman, Montana, for the care of a patient who is mentally disturbed by reason of toxic psychosis or some related disease. Plaintiffs called Dr. Townsend who was to testify as an expert as to the standard of care for diagnosing and treating toxic psychosis in Bozeman, Montana. As an internist and hematologist the area of organic and toxic psychosis was within Dr. Townsend's specialty. He had extensive experience in hospitals of varying sizes throughout the United States. The defendants do not dispute his general qualifications but simply contend he had not practiced in a hospital similar in size to that of Bozeman Deaconess and therefore was not qualified to testify as to the standards of care at Bozeman Deaconess.

In past years Dr. Townsend had practiced in hospitals similar in size to Bozeman Deaconess. It appears moreover, plaintiffs were asking him what the standard of care was in Bozeman Deaconess, not what the standard of care was in other hospitals similar in size to Bozeman Deaconess. Dr. Townsend had gone over Hunsaker's medical and hospital records and had acquainted himself with the standard of practice in Bozeman by talking with a Bozeman doctor who practiced in the hospital. He was prepared to testify as to what Bozeman

-18-

Deaconess and defendant physicians should have done to properly handle a case of toxic psychosis. The record while Dr. Townsend was on the witness stand, is punctuated with successful defense objections on numerous grounds, but mainly directed to foundation--that is, his familiarity with practice in a hospital the size of Bozeman Deaconess. Finally, however, plaintiffs asked the following question:

> "Q: Based upon what you learned by reviewing the chart that we made reference to and the various other documents, the by-laws, the licensing laws, are you able to form a reasonable judgment of what the standards of care are in Bozeman, Montana, for the care of a patient who is mentally disturbed by reason of toxic psychosis or some related disease?"

Because of defense objections, the court refused to let Dr. Townsend go beyond a "yes" answer. In explaining his ruling the court stated: "You [defense counsel] have pretty well established that any knowledge he has here is hearsay. I have tried to go as far as I can. It seems to me we are just wasting time."

It is difficult to imagine any expert testimony that does not to a degree, rely on information that from a strict legal standpoint is hearsay. If this Court were to prohibit all expert opinions which rely on hearsay evidence, the courthouse doors would be virtually closed to the giving of expert opinion on any subject. In this technical world in which we live, the need for expert medical opinion to help resolve factual disputes has never been greater. The special problems involving medical testimony and hearsay evidence have been succinctly summarized in Vol. 53 Texas Law Review (No. 2, January, 1975), where the author states:

> "A doctor's methods for gathering the facts on which to base his opinion, unfortunately,

-19-

do not always mesh well with evidence law. The hearsay rule, which generally excludes statements made out of court and offered to establish the truth of the matters asserted, would prevent a doctor from testifying to virtually anything that he has learned from others. Moreover, since the rules regarding opinion testimony commonly prevent experts from basing their opinions on hearsay, the rule would seem to prevent a doctor from rendering an opinion in court. The rule, however, is not so rigid. Experts may in fact base their opinions on their general education and training and their continued medical readings even though these sources are technically hearsay. Hearsay restrictions still apply, however, when the expert turns from his general background to the facts of the particular case.

"The hearsay rule restricts the free flow of medical testimony in two interrelated ways. First, it limits the circumstances in which the doctor may repeat in court, or base an opinion on, the statements that others have made about a patient's condition. Second, it restricts the circumstances in which a party may introduce a doctor's written opinion about a patient's condition. Since both restrictions conflict with the manner in which doctors commonly perform their non-judicial functions, each at least creates an inconvenience for both litigants and the medical profession and may deprive the fact-finders of valuable evidence." Vol. 53 at p. 297.

In the present case, the jury was deprived of valuable evidence which it could have weighed alongside that of the defendants and their experts. It would have been helpful if the jury had the witness's opinion as to the proper methods for diagnosing, treating and handling a patient with toxic or organic psychosis. The focal point of the offered testimony was not that of hospitals similar to Bozeman Deaconess, but that of Bozeman Deaconess itself. That Dr. Townsend may have relied on hearsay information to acquire this knowledge is something that could have been explored on cross-examination. The offered opinion went to the weight of the testimony and not to the competency of Dr. Townsend to render the opinion.

Plaintiffs also complain that the defendant hospital was permitted to ask improper questions of the hospital supervisor who was on duty at the time that Hunsaker jumped out the window. The questions were asked her after plaintiffs had concluded their examination of her under the adverse witness rule. She gave her opinions on the adequacy and competency of the personnel at the hospital while Hunsaker was a patient. Plaintiffs claim that no foundation was laid for this testimony, but her background and qualifications were established in detail during defendant hospital's examination of the witness. Plaintiffs did not object to this testimony. It is true that the opinion testimony elicited went beyond the scope of the examination-in-chief and no reason appears why the supervisor could not have been called to testify while the defendant hospital was putting on its case. We do not however, consider this error to be prejudicial.

On the other hand, it was prejudicial error to permit the nurse supervisor to testify that another nurse-supervisor (whose testimony was read into the record by deposition) was "honest and trustworthy." That testimony took on added weight when it is considered that the nurse-supervisor testified directly contrary to one of plaintiff's witnesses on the question of whether the security room was locked. An orderly testified that he attended Hunsaker on the 4:00 p.m. to 12:00 p.m. shift and that the nurse-supervisor kept him locked in the security room while attending Hunsaker. If the orderly wanted to leave the room for any reason he had to knock on the heavy glass window and the nurse-supervisor came with the key and opened the door. The nurse-supervisor testified (by deposition) that the orderly was never locked in the room with the patient. The testimony that this supervisor was "honest and trustworthy" clearly took on the form

-21-

of character testimony for which there was no foundation. Indeed, character was never put in issue.

The next series of claimed errors relates to the doctrine of res ipsa loquitur and the court's instructions on the doctrine. Over defendants' objections the court instructed the jury on the doctrine of res ipsa loquitur. Under the instructions the jury was entitled to find that the doctrine applied not only to the hospital but also to the defendant physicians. The instruction given was the standard jury instruction on res ipsa loquitur as found in the Montana Jury Instruction Guide (No. 22.00.) It was given without modification. In addition to this instruction, the plaintiffs offered supplemental instructions on res ipsa loquitur but the trial court refused each of them. Plaintiffs assign this as error.

We note at the outset that the doctrine, in the context of this case, did not apply to the defendant physicians. In Maki v. Murray Hospital (1932), 91 Mont. 251, 7 P.2d 228, this Court held that res ipsa loquitur applied in an analogous situation to the defendant hospital. The plaintiffs here offered no theory at trial nor to this Court as to why the doctrine should apply to the defendant physicians. The defendant physicians were not attending Hunsaker at the time he jumped out the hospital window. Indeed, they were not even in the hospital. Whether the defendant physicians had made the proper diagnosis of Hunsaker's condition or had given the proper orders to the hospital personnel, was covered by specific allegations of negligence. It stretches the doctrine of res ipsa loquitur beyond the breaking point to apply the doctrine to the physicians under these facts.

In its application to the hospital, the res ipsa loquitur instruction, although setting forth the elements, should have

-22-

been modified to fit in the context of this case.  Plaintiffs did offer another instruction in simpler terms, but the instruction was refused.  We note moreover, that the District Court refused an instruction offered by plaintiffs distinguishing circumstantial evidence from direct evidence.  Res ipsa loquitur, is, of course, a form of circumstantial evidence, and the instruction defining circumstantial evidence should have been given.

The trial court instructed the jury that "the mere fact of an injury or the occurrence of a bad result, standing alone, is no proof whatsoever of negligence in an action such as this."  Plaintiffs contend this was error, particularly in a situation where the plaintiffs rely upon res ipsa loquitur.  In the ordinary negligence case we would agree, but in a professional negligence action, it is not error to give an instruction that an unsuccessful effort, a mistake, or an error in judgment is not necessarily negligent.

In Graham v. Rolandson (1967), 150 Mont. 270, 435 P.2d 263, an ordinary negligence action, we condemned an "unavoidable accident" instruction.  There we concluded that it injected a straw issue into the case and is confusing to the jury.  This is somewhat akin to "the mere fact of an injury" instruction as was given in this case.  In Gagosian v. Burdick's Television & Appliances (1967), 254 Cal.App.2d 316, 62 Cal. Rptr. 70, California eliminated "the mere fact of an injury" instruction from ordinary negligence actions, stating:

> ". . . Since it but elucidates the obvious
> to the jury, and need not be given to meet
> any rule of appellate procedure, we join
> heartily in the recommendation of its authors
> for its 'decent burial.'  The trial judge who
> strikes the 'mere happening' instruction from
> his instruction book and completely erases it
> from his memory will save time in instruction
> and much in retrial after reversal."

We also conclude that in an ordinary negligence action that such instruction should be given a "decent burial" in this State.

In professional malpractice actions however, California retains a modified form of "the mere fact of an injury" instruction. For example, California Jury Instructions, Civil (BAJI, 6th Edition, 1977), Instruction No. 6.02 states:

> "A physician and surgeon is not negligent
> merely because [his efforts are unsuccessful]
> [he makes a mistake][he errs in judgment] in
> the matter for which he was engaged.
>
> "However, if the physician and surgeon was
> negligent as defined in these instructions,
> it is not a defense that he did the best
> he could."

We believe this is a proper instruction. Also see instruction no. 6.37.2 which has similar application to actions against other professionals, such as lawyers.

Plaintiffs next contend that the court erred in giving an instruction on medical negligence which concluded with the following sentence:

> ". . . A doctor is not liable for a mere
> error in judgment, provided he does what
> he thinks is best after a careful examination."

Plaintiffs contend that the test of negligence is not for a doctor to do what he thinks is best, but whether he used the required knowledge and training in making the judgment to do what he thinks is best. The language used was modified to an extend by the words "after a careful examination", but a different instruction should be given. The instruction set forth in the preceding issue is sufficient.

The court refused plaintiffs' instruction that Hunsaker would not lose the benefit of the application of the doctrine of res ipsa loquitur by introducing evidence tending to show specific acts of negligence. In Whitney v. Northwest Greyhound (1952), 125 Mont. 528, 535, 242 P.2d 257, this Court stated:

> "Where res ipsa loquitur is otherwise
> applicable, a plaintiff does not lose
> the benefit of that presumption by
> alleging specific acts of negligence
> of the carrier which he fails to prove . . ."

We note however, that under the other instructions, given in the case at hand, there was no basis for the jury to conclude that the plaintiff was precluded from relying on res ipsa loquitur because he alleged specific acts of negligence. Accordingly, we find no error.

Plaintiffs further contend that the trial court should have instructed the jury that exclusive control of the instrument did not mean physical control at the time plaintiff sustained his injuries. But the facts of this case did not require such an instruction. In Baumgartner v. National Cash Register (1965), 146 Mont. 346, 406 P.2d 686, we held that actual physical control at the time of the accident is not required. The facts of that case differ materially from the facts of the instant case.

In Baumgartner, plaintiff suffered an electrical shock from a cash register manufactured and distributed by the defendant. Undoubtedly, for res ipsa loquitur to apply in that factual context, plaintiff was not required to prove that National Cash Register Company had actual physical control over the cash register at the time plaintiff was shocked. In the instant case the defendant hospital did not dispute that it had physical control over the operations of the hospital and the security room of the hospital. Under these facts the court properly refused the instruction.

At the request of defendant hospital, the court gave the following instruction relating to expert testimony and the application of res ipsa loquitur:

> "In determining whether the accident was of
> such a nature that it does not ordinarily
> occur if the party in control exercises
> reasonable care, you must examine whether
> that determination involves the resort to
> medical opinion and judgment beyond the
> common knowledge of a layman. If you find

-25-

that the cause of the accident was so
inextricably bound up in a course of
medical judgment beyond the common knowledge
of laymen, then the previously described
inference of negligence does not apply in
this case."

The instruction is not one that should be given to a jury as a barrier to overcome before it can apply the doctrine of res ipsa loquitur. At the conclusion of the case the evidence was such that the trial must have concluded that the elements of res ipsa loquitur were satisfied and that the injuries received by Hunsaker were not so inextricably bound up in an antecedent course of treatment involving the exercise of medical judgment beyond the common knowledge of laymen. The instruction served only to confuse the jury.

As its last contention of error in instructing the jury plaintiffs contend that the District Court improperly instructed the jury that in the absence of an emergency the nurses and other hospital personnel are bound to follow the orders of the treating physician. The instruction was proper. Neither case cited by plaintiffs is applicable to the facts of this case. In Livingston Hospital v. White (Ky. 1952), 245 S.W.2d 927, the attending staff physician made a note on a hospital form recommending that the patient be kept under "special observation for suicide or escape." The hospital staff left the patient unattended and the patient jumped through a window severly injuring himself. This is a clear case of the hospital personnel not following the physician's order. In Rural Education Ass'n. v. Anderson (Tenn. 1953), 261 S.W.2d 151, the patient's family physician before he went on an extended vacation instructed the hospital staff to keep a loose surveillance on the patient. While the physician was on vacation, the patient became critical and increased observation was required. Later a staff physician order increased surveillance,

-26-

but the hospital staff left the patient unguarded on the third floor of the hospital. The patient jumped through the window and received extensive injuries. This was a clear case of an emergency situation where the hospital failed to increase surveillance when it was needed and actually ordered by staff physician.

We agree with the statement contained in Mesedahl v. St. Luke's Hospital Ass'n. of Duluth (1935), 194 Minn. 198, 259 N.W. 819:

> ". . . The nurses and internes at a general hospital are charged with the duty of carrying out the instructions of the attending physician, except in cases of emergency. Such of necessity must be the rule. When a patient enters a hospital upon the advice of a physician chosen by him, he naturallly desires and expects, and has the right to expect, that the instructions of his physician will be complied with. He relies upon the skill of his own doctor; he knows nothing of the ability of the internes and nurses. Where an emergency arises, it is, of course, incumbent upon the nurses or internes to exercise their own judgment until report can be made to and instructions received from the attending physician. . ."

The problem of jury instructions with which we were faced in this case and with which we have been increasingly confronted with, impels us to discuss the subject of jury instructions. The res ipsa loquitur instruction given in this case, without any modification, was taken from the Montana Jury Instruction Guide, Instruction No. 22.00. This instruction was adopted verbatim from an earlier edition of California Jury Instructions. The instruction is cumbersome and extremely difficult to understand. We note, however, that for several years now, the California instructions on res ipsa loquitur have been substantially revised. Presently, there are several instructions relating to res ipsa loquitur.

California has had extensive litigation in the field of hospital and medical malpractice and undoubtedly because

of this, specific instructions on the application of res
ipsa loquitur to this area of the law, have been drafted
by the bench and bar.  (California Jury Instructions, Civil,
6th ed., Instructions No. 6.35, 6.36.)  Comparatively speaking,
this State has had little litigation in this area.  Con-
sequently, decisional law in this State is sparse.  The
trial bench and trial bar are encouraged to seriously consider
the use of pattern jury instructions from other states as
long as they are not inconsistent with the law of this
State. Even if inconsistent, the form of the instruction can
be used as a model for drafting one that complies with the
law of this State.  The committees drafting these instructions
have labored long and hard to create fair and meaningful
instructions. Not only will considerable time and effort be
saved by using these pattern instructions, but more importantly,
the chances of the jury receiving proper instructions are
considerably enhanced.

We note also that counsel frequently draft instructions
at the last moment with little thought given as to whether
they are fair and accurate statements of the law.  They are
frequently drafted from an adversary position and as a
result they tend to unfairly benefit one of the adversaries.
That is not the purpose of jury instructions.  Jury instructions
are no place to make final arguments.  In addition to being
easily understood, instructions should be a fair statement
of the law and not slanted to the side of one adversary or
the other.

Another problem that this Court frequently confronts
is that counsel or the trial bench too often draft instructions
in the literal language of the opinions of this Court or the
courts of other jurisdictions.  While occasionally a statement

-28-

in an opinion may also be a good jury instruction, we emphasize that opinions are not designed to be jury instructions. We are confident that the trial bench, together with counsel, if they take sufficient time and effort, can draft instructions that are better jury guides to the law than the literal language taken from court opinions. We encourage the bench and bar to take the time to do so.

Finally, it would greatly aid in the submission of proper instructions to the jury, if the District Courts would adopt and compel enforcement of a local court rule requiring that jury instructions be submitted to the court, with appropriate supporting authority, before commencement of the trial.

There are several more claims of error asserted by plaintiffs but our decision on them would not be helpful to the retrial of this cause. If the issues do arise at the next trial, they will not be in the same context as presented to us in this appeal.

The judgment is vacated and the cause is remanded for a new trial.

_Daniel J. Shea_
Justice

We Concur:

_____
Chief Justice

_Gene B Daly_
_____

_____
Justices

-29-

Mr. Justice John Conway Harrison concurring in part and dissenting in part:

I concur in the result reached by the majority but not in all that is said therein. Specifically, in regard to two holdings of the opinion:

First, as to the charge that the hospital failed to use the standard of care required, and the denial of the testimony of Dr. Bayles' testimony on that standard, I would sustain the trial judge's denial of this testimony on the ground that the transcript failed to show that Dr. Bayles was familiar with those standards.

Second, I would sustain the trial judge's refusal to allow Dr. Townsend's testimony on the standard of care required by both the hospital and the doctors attending Mr. Hunsaker. Dr. Townsend practiced in the federally established hospitals and, in my opinion, had no expertise as to the standards in local Montana medical institutions. For the same reasons, I did not concur in this Court's opinion in the case of Tallbull v. Whitney (1977), _____ Mont. _____, 564 P.2d 162, 34 St.Rep. 356.

_____
Justice

Mr. Chief Justice Frank I. Haswell specially concurring:

I concur with the result in the majority opinion but not in all that is said therein.

I would grant a new trial on the following grounds for the reasons set forth in the majority opinion:

(1) Reversible error in excluding the expert opinion evidence of Dr. Dayles and Dr. Townsend;

(2) Reversible error in admitting the testimony of nurse-supervisor Augney that another nurse-supervisor was "honest and trustworthy".

```
_____
            Chief Justice
```