Argued March 3, affirmed September 11, 1970

# WATERWAY TERMINALS COMPANY, *Respondent, v.* P. S. LORD MECHANICAL CONTRACTORS ET AL, *Appellants.*

474 P2d 309

*George M. Joseph*, Portland, argued the cause for appellants. With him on the briefs were Morrison & Bailey, William H. Morrison, Thomas S. Moore, Mautz, Souther, Spaulding, Kinsey & Williamson, Bruce Spaulding, and Ridgway K. Foley, Jr., Portland.

*Darrell L. Johnson*, Portland, argued the cause for respondent. With him on the brief were Bullivant, Wright, Johnson, Pendergrass & Hoffman, R. R. Bullivant, and Douglas G. Houser, Portland.

Before PERRY,* Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE and HOLMAN, Justices.

HOLMAN, J.

This case concerns an action to recover damages caused by fire. Plaintiff secured a judgment based upon both a general and a special jury verdict against all defendants jointly and severally in the sum

_____

* Perry, C.J., retired June 1, 1970.

of $206,408.85 and against the defendant P. S. Lord Mechanical Contractors (Lord) for an additional sum of $145,814.57. This case was previously before this court as the result of a prior trial and appeal. *See Waterway Terminals v. P. S. Lord*, 242 Or 1, 406 P2d 556, 13 ALR3d 1 (1965).

Plaintiff was in the process of building a large dock and warehouse in the city of Portland on the west side of the Willamette river. The installations were primarily for the automated handling of water cargo from water level to warehouse. Plaintiff entered into a contract with Mechanical Handling Systems, Inc., (MHS) to supply and install all mechanical portions of the system. MHS, in turn, subcontracted the furnishing and installation of six cargo lifts in the dock, by which materials from barges at river level would be raised to the level of the dock, to Colby Steel and Manufacturing, Inc., (Colby). Colby subcontracted the installation of the lifts to Lord.

On September 11, 1958, Lord was in the process of extending the already installed channel guides for the lift in cargo well No. 4. This necessitated welding ten-inch pieces of channel guide onto the top of the existing guides with an electric arc welder in both inshore corners of the well so that the guides would reach the level of the dock. The lift platform was lowered to about three feet below the dock level, and two of Lord's workmen, a welder and a helper who was acting as fire watch, stood on the platform while doing the welding. The existing channel guides were bolted to vertical timbers. The workmen first completed the weld on the guide in the southwest corner of the lift well. In order to protect the timber to which the guide was attached, a piece of sheet metal had been inserted during the welding between the guide

and the timber. The sheet metal shield had fused to the channel guide during the welding and the balance of the shield was cut away with the welding torch upon completion of the weld. This created molten slag which, along with sparks from the welding, fell through the open space at the side of the lift well between the level of the dock and the lift platform. The dock was supported by creosote-impregnated pilings and timbers.

After completing the extension of the guide at the southwest corner of the cargo well, the welder moved over to perform the same operation on the guide at the northwest corner of the well. During this time the helper went down the dock to find another piece of sheet metal for a shield. Some twenty minutes later, at about the time the helper returned and the welding on the other guide was commenced, smoke was discovered coming up from below and along the side of the lift platform at its southwest corner. Despite efforts to quell the blaze, this fire ultimately did the damage for which recompense is being sought in this case.

■ The court submitted to the jury certain claims of contributory negligence against the plaintiff, such as failure to have a sprinkler system in use at the time of the fire, failure to warn that the sprinkler system which was installed was not operative, and failing to have fire doors or other ready access to the part of the structure where the fire commenced. In submitting these claims of contributory negligence to the jury and in instructing on contributory negligence generally, the court at numerous times instructed that in order to bar recovery by plaintiff, the negligence must be the proximate *cause of the fire*, rather than instruc-

ting that it must be the *cause of the damage*. Also, several of defendants' requested instructions concerning contributory negligence were not given which spoke in terms of cause of the damage. Defendants contend that the result was to instruct them out of court insofar as their claims of contributory negligence were concerned, because it is obvious that lack of an effective sprinkler system, or of fire doors or warnings, cannot cause a fire.

The validity of defendants' contention depends upon whether or not the jury would likely have understood that the term "cause of the fire" meant what caused the fire to start rather than what caused it to spread and consume part of the dock. We believe that the jury would have understood that what was being referred to was what caused the total conflagration which inflicted the damage. In the first place, as defendants point out, it is obvious that lack of a sprinkler system or of fire doors cannot start a fire. The fact that such allegations of contributory negligence were submitted to the jury negates any inference that the court was referring to what caused the initiation of the fire.

Also, other parts of the court's instructions were consistent with the idea that what was being referred to was the cause of the destruction of the dock. In instructing on proximate cause, the court said as follows:

"The phrase 'proximate cause' as used in these instructions means probable cause, direct cause. It is such a cause which in a natural and continuous sequence, unbroken by any other or new cause, would probably *lead to injury*, and which has been shown to you to have *led to injury*, and *without which the results would not have occurred*. In other words, proximate cause is a cause *which leads di-*

*rectly to the situation complained of,* without the interference of any other or new cause.

"*You will disregard any negligence which you may find as alleged in this case, unless such negligence was a proximate cause of the damage or injury.*" (Emphasis ours.)

In addition, the court, in referring to plaintiff's contentions in its complaint, stated:

"In this case the plaintiff brings this action against these defendants, claiming and alleging that these defendants were negligent in certain particulars, as alleged in the plaintiff's complaint, *and that such negligence, as alleged, was a proximate cause of plaintiff's damage* as set forth in the complaint." (Emphasis ours.)

Admittedly, the plaintiff in its argument to the jury strenuously argued that lack of a fire door or of a sprinkling system could not start a fire, but his argument went unchallenged. Plaintiff had previously attempted to get the court to remove the allegations of contributory negligence from the case upon the ground that the things of which defendants complained in their allegations could not start a fire, and the court denied the request.

■ Defendants next contend that the court erred in giving a res ipsa loquitur instruction. Not only do they contend that it should not have been given, they contend the instruction given was erroneous in any event. Defendants first call to the court's attention that in order for res ipsa to apply, the injury must be one that does not ordinarily happen if those having control exercise due care. They contend that such an instruction was not applicable because the following testimony by defendants' expert witness concerning welding demonstrated that fires are caused by weld-

ing even when all possible precautions are taken. The testimony of the witness was as follows:

"Q. Now your company, you say, handled a large percentage of that, so you do use extra precautions on those things?

"A. That's right, extra precautions.

"Q. And even though,—on this kind of a job—even though you use extra precautions, you still get fires?

"A. Oh, yes, we get fires started, and have lots of them start.

"Q. Even though you use precautions?

"A. That's the reason they are policed so tightly.

"Q. That's why it's very necessary to have a live hose around that fire, so that you can put it out?

"A. That's right."

In making this contention, defendants are taking an opposite position from that which they took in relation to the court's instructions on the "cause of the fire" which have previously been considered in this opinion. Here they are contending that the emphasis should be on the start of the fire rather than on the total conflagration which enveloped the dock. They say that res ipsa is not applicable because fires are started even when proper precautions are used. The answer to defendants' contention is that the thing under consideration is the uncontrolled conflagration that caused the damage. As the witness indicated, welding starts fires so easily that they have to be tightly policed and a live hose is necessary. Such fires do not usually get out of control and cause damage unless the welders fail to take proper precautions.

■ In addition, defendants contend that if it be shown that the injury was due to plaintiff's own fault

or omission, res ipsa cannot be used as a basis for an inference of negligence. We need not consider this contention because no exception was taken to the court's instructions on this basis.

■ Defendants also took exception on several bases to the res ipsa instruction which was given. The instruction was as follows:

> "The mere occurrence of a fire does not raise a presumption of negligence. However, if you find that the welding and cutting operation was under the sole management and control of the defendants, or that the defendants had the right to manage and control the welding and cutting operation, and that the fire, in the ordinary course of things, probably would not have happened if someone had not failed to exercise due care, it affords evidence, in the absence of explanation by the defendants, that the fire arose from the want of care of the defendants."

First, defendants say that the instruction did not require the jury to find that the fire which did the damage was caused by the welding. Second, they point to the use of the word "someone" in "fire in the ordinary course of things, probably would not have happened if *someone* had not failed to exercise due care." Of course, "someone" should have been "defendants." Defendants contend that the instructions made them responsible for the actions of anyone—not just for the actions of those whom they had a right to control. Third, defendants point out that the instruction did not tell the jury that the lack of due care must have been such a lack of due care as was alleged in plaintiff's complaint.

■ The exact wording of instructions is something which judges and lawyers, despite their technical training, often disagree upon and discuss in minute

detail at great lengths. It is absurd to expect a layman to listen once to an oral rendition of a highly technical instruction and to appreciate immediately all of the fine legal distinctions. As a result, cases should not be reversed upon instructions, despite technical imperfections, unless the appellate court can fairly say that the instruction probably created an erroneous impression of the law in the minds of the jurymen which affected the outcome of the case. It is our conclusion that any juryman would realize that the court was referring to fire caused by defendants' lack of care in welding such as was specified in the plaintiff's complaint. The instruction was not given in a vacuum but in reference to the contentions of the parties in their pleadings and to the other instructions which were given. It is our conclusion that no prejudicial error resulted.

■ Defendants also assign as error the trial court's refusal to strike plaintiff's following allegation of negligence:

"6. Failed to use proper or any care and caution in performing said welding and cutting operations to prevent the occurrence of a fire when said Defendants, and each of them, knew, or in the exercise of reasonable care should have known, that the fire danger under the conditions then and there existing was extremely great."

This general allegation followed numerous specific allegations of negligence which also were submitted to the jury. The defendants contend it should have been stricken because it was a non-specific allegation. They argue that where a general allegation is coupled with specific allegations, the specific allegations control. Defendants rely upon some cases which do not

involve res ipsa and are, therefore, not applicable. They also rely upon *Brannon v. Wood,* 251 Or 349, 356-57, 444 P2d 558 (1968), and *Boyd v. Portland Electric Co.,* 40 Or 126, 132, 66 P 576, 57 LRA 619 (1902). These cases hold that the application of res ipsa is limited to the specific allegations of negligence alleged. However, they were cases in which no general allegation of negligence was also alleged. The specific question involved here was decided by *Short v. D.R.B. Logging Co.,* 192 Or 383, 393, 232 P2d 70, 235 P2d 340 (1951), which contains the following language:

> "The rule in Oregon is that, where a plaintiff makes specific allegations of negligence in his complaint, he may invoke *res ipsa loquitur,* if applicable, as to such specific acts [citing cases]. Lest we be misunderstood, we hasten to add that, of course, he may, if he wishes, allege negligence both generally and specifically, and invoke *res ipsa,* if applicable, as to either or both."

Prosser, *Torts* 237, § 40 (3d ed 1964) also sustains the rule of *Short* as being the better one.

Defendants next contend that the trial court erred in permitting the jury to return a verdict in different amounts against three joint feasors. Two verdicts were submitted to the jury in the event it found for plaintiff. The first verdict was a general one against all defendants, and was as follows:

> "We, the jury, duly empaneled to try the above entitled cause, find our verdict in favor of Plaintiff and against the Defendants."

In addition, a special verdict was submitted, as follows:

> "This special verdict is to be used by the jury only if the jury finds in favor of Plaintiff and

against the Defendants. In that event each of the following findings should be completed:

"1. We find the total damages sustained by Plaintiff herein to be the sum of .............................

"The jury is instructed by the Court that this may not exceed the sum of $352,223.02.

"2. We find the total damage sustained by Plaintiff on the cargo lifts to be the sum of ................

"The jury is instructed by the Court that this may not exceed the sum of $145,814.17.

"3. We find the damage sustained by Plaintiff, other than damage to the lifts, to be the sum of ..............................

"The Court instructs the jury that this may not exceed the sum of $206,408.85."

The unusual form of the verdicts resulted from our decision in the first appeal of this case that the part of the contract between plaintiff and MHS which related to the purchase and installation of the cargo lifts required plaintiff to maintain fire insurance on the lifts during installation for the protection of MHS and Colby. Plaintiff did not secure insurance to protect MHS and Colby but only to protect itself, and we, therefore, held that MHS and Colby had a complete defense against a claim by plaintiff for damages to the cargo lifts. We also held that Lord was not a beneficiary of this agreement.

■■ The purpose of the rule against apportionment of damages is to prevent the jury from making arbitrary and speculative divisions of damages in situations in which a number of defendants have combined to produce a single injury. Prosser, *Torts* 248, § 42 (3d ed 1964) states as follows:

"* * * The question is primarily not one of the fact of causation, but of the feasibility and prac-

tical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a logical basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which he has in fact caused, it may be expected that the division will be made. Where no such basis can be found, and any division must be purely arbitrary, there is no practical course except to hold the defendant for the entire loss, notwithstanding the fact that other causes have contributed to it."

In the present situation, the jury returned a general verdict against all defendants. By its special verdict, it did not apportion the damage caused by each defendant but, rather, divided the loss in relation to the kind of property which was destroyed. The evidence of the plaintiff's damage was submitted in such a manner that there was an evidentiary basis for such a division. The court was the one who apportioned the damages among the defendants, but it was not done on the basis of how much of the harm each of the defendants caused but, rather, on the basis of a contractual defense by two of them as to part of the loss.

The situation is very similar to the case of *Wiebe v. Seely*, 215 Or 331, 335 P2d 379 (1959). In that case, plaintiff brought a suit for damages for personal injuries suffered in an automobile accident against the owner of the car and against the estate of the deceased driver of the same car. The jury returned a verdict for the plaintiff against both of the defendants and set the damages at $60,000. At that time, however, there was a statute in Oregon which limited the liability of the estate of a deceased wrongdoer for personal injuries to $15,000. The court, therefore, imposed judgment against the owner of the car for $60,000, but en-

tered a judgment against the estate for $15,000. The judgments for the differing amounts were upheld on appeal.

Defendants argue as follows:

"* * * [T]he submission of the special verdict carried the prejudicial risk that the jury could compromise between them [MHS and Colby] on the one hand and the one with full liability on the other [Lord]. The risk to the defendant Lord was that the jury could view it as having the other defendants available to help satisfy the joint judgment and thus be able to stand the excess judgment alone."

The fallacy in the contention is that the jury was not told that different judgments were going to be imposed upon the defendants. In addition, the argument that the jury might believe that Lord could better stand a larger judgment because someone else was also responsible is equally applicable to any one of multiple defendants regardless of whether the amount of the judgment against each of them is the same or not. There was no error.

Defendant Lord next contends that the court erroneously submitted plaintiff's claim to the jury for three cargo lifts which were damaged or destroyed in the fire. Defendant argues that title to the lifts was in Colby at the time of the fire, and, therefore, damage to the lifts could not be the basis for a claim by plaintiff. Lord admits that the various documents in which plaintiff, MHS and Colby were involved had no express provisions regarding passage of title to the lifts. However, it refers to certain provisions in the documents between plaintiff and MHS which, it claims, indicated that title was not to pass to plaintiff until completion of the work upon the cargo lifts and accept-

ance of them by plaintiff. Colby, of course, by its agreement with MHS, assumed MHS's obligation to Waterway insofar as it concerned the furnishing and installing of the lifts. The provisions of the agreements asserted by Lord as a basis for its claim that title was still in Colby are as follows:

"3—DELIVERY

"Supplier to furnish and install, complete, tested and ready for operation * * *.

"* * * * *.

"14—UNLOADING AND STORAGE

"The customer to unload all the material and equipment * * *, excepting for Colby Cargo Lifts * * *."

The following provision in another document is also asserted by Lord:

"DELIVERY

"As required to turn over to customer the completely installed, tested and ready for operation system by November 1, 1958."

Lord was not a party to these documents. The intention of the parties to the documents is the pertinent factor in determining whether title had passed from Colby to plaintiff at the time of the fire. After the fire and before the action was filed, plaintiff paid Colby almost $150,000 for the repair of the lifts. In addition, plaintiff made a progress payment to MHS which included work done before the fire without any diminution for the damage caused by the fire. The payment was made pursuant to an understanding that it did not constitute a waiver of claims arising out of the fire. These payments unmistakably show that the parties considered the risk of loss to be in plain-

tiff. The documents showing the progress payment were offered by plaintiff and erroneously rejected by the court when defendants objected. The documents were relevant to the point now under consideration. Though they were not received, they may be considered by this court in determining whether the trial court made a mistake of law in allowing plaintiff to claim the loss caused by the damage to the lifts. When the parties to the documents show by their actions that they agree upon what they intended by ambiguous and non-specific provisions, Lord, as a third party with no beneficial interests in the agreement, is in no position to contend that the effect of the documents was other than that which the parties intended.

In addition, the law of the case made by the first appeal establishes plaintiff's beneficial interest in the lifts at the time of the fire. This was implicit in the decisions made there concerning the fire insurance clause relating to coverage of loss to the lifts and Lord's inability to benefit by the clause. These decisions were unnecessary unless this court decided that plaintiff had the beneficial interest in the lifts at the time of the fire.

We have discussed in detail the assignments of error which we considered to be of the greatest substance. We do not propose to discuss the many other assignments of error, other than to say that we have considered them and have found them wanting in merit.

The judgment of the trial court is affirmed.