JEFFREY L. AZURE, by and through his next friend and guardian ad litem, DOROTHY MARCHINGTON, Appellant and Plaintiff, *v.* THE CITY OF BILLINGS, an Incorporated Montana Municipality, Respondent and Defendant.

No. 14079.
Submitted Oct. 17, 1978.
Decided May 30, 1979.
As Amended On Denial of Rehearing July 11, 1979.
596 P.2d 460.

236

Lynaugh Fitzgerald, Schoppert, Skaggs & Essman, William Fitzgerald (argued), Billings, George Huss (argued), Miles City, for appellant and plaintiff.

Keefer & Roybal, Neil S. Keefer (argued), Billings, for respondent and defendant.

MR. JUSTICE SHEA delivered the opinion of the Court.

Plaintiff, who was the nominally successful party below, appeals from a jury verdict and judgment in the Yellowstone County District Court, awarding him $20,000 in damages against the defendant City of Billings. He contends that several errors occurred during the course of the trial which prevented the jury from awarding him adequate compensation.

Plaintiff filed this action against the City of Billings (City herein) seeking approximately one million dollars in damages because of the alleged negligence of the City in failing to bring him to an emergency medical service, as required by statute. As a result of this failure he alleged that he is permanently and totally disabled.

The facts giving rise to this lawsuit follow. Plaintiff, while in a Billings bar, was assaulted by the bar owner with a heavy, blunt object commonly known as a sap. He was found by Billings police approximately seven hours later in a seemingly intoxicated condition. The police had responded to a call reporting what seemed to be an attempted burglary and they discovered plaintiff on the premises. They placed plaintiff under arrest and took him to the

city jail. Plaintiff was charged with public intoxication and trespass. The intoxication charge was based on the officers detecting the smell of alcohol on plaintiff and his general demeanor which was indicative of intoxication. Although plaintiff showed obvious signs of recent injury, mainly two black eyes, a large bruise on his forehead, and dried blood on his lips and teeth, he remained in jail for sixteen hours before the police sought medical treatment for him.

By the time the police took plaintiff to a hospital emergency room his condition had significantly deteriorated and he was in a semiconscious condition. At the hospital, he received an initial examination but nothing was detected. Approximately thirty hours later, during which time he had been under observation for signs of neurological deterioration, Dr. Wood, a neurosurgeon, determined the blows plaintiff received had caused blood vessels to break in plaintiff's brain. The broken blood vessels in turn began to form blood clots (hematomas). The clots were then surgically removed. The surgery, however, did not appreciably correct plaintiff's physical problem. Plaintiff lost his right field of vision in both eyes and he is permanently and totally disabled.

Plaintiff filed separate lawsuits, one against James Mankin, the person who had assaulted him, and·the other against the City of Billings. He received a $10,000 settlement from Mankin. This amount was the limit of Mankin's insurance policy.

Before the trial started against the City of Billings, the trial court granted plaintiff's motion in limine to prohibit the defendant from introducing evidence that plaintiff had settled with Mankin for $10,000. The court granted the motion because such evidence would be prejudicial to plaintiff's case. However, the trial court denied plaintiff's motion which sought to prohibit defendant from introducing evidence identifying the person who assaulted the plaintiff.

The main battleground was the issue of causation. Plaintiff contended that his permanent injuries were at least in part the proximate result of the failure of the City police to take him to an

emergency medical service as required by statute. Plaintiff's medical expert, Dr. Wood, who was the treating physician, testified that the delay of sixteen hours in the police station contributed significantly to the formation and damaging effects of the hematomas, which ultimately caused plaintiff's permanent disability.

Defendant, on the other hand, contended that the plaintiff's permanent disability could be laid directly at the doorstep of the person who had assaulted him, and that the delay in taking plaintiff to a hospital did not contribute to the ultimate permanent injuries sustained by plaintiff. Defendant's medical expert, Dr. Hitselberger, a neurologist, testified that the resulting injuries were caused directly by the severe blows. According to Dr. Hitselberger, the sixteen hour delay out of a total fifty-three hour delay between injury and surgery played no casual role in bringing about plaintiff's permanent injuries.

On the issue of damages plaintiff introduced evidence showing the extent of his physical disability as well as wage losses and medical expenses incurred up to the time of trial, and of course future anticipated wage losses and medical expenses. An economics expert testified to the losses incurred and those projected for the future life expectancy of the plaintiff. The undisputed past wage losses and medical expenses up to the time of trial were $60,122. Future wage losses, together with future medical expenses, were estimated to be $987,550. There were, moreover, additional losses about which an economics expert could not testify, such as past and future pain and suffering. Before his injury, plaintiff had been a skilled welder, then employed at the Colstrip project. Defendant presented no evidence on damages.

Before taking any evidence in the case, to the jury, the trial court ruled on the question of liability that the City of Billings had violated a statute intended for the plaintiff's protection in failing to bring plaintiff to an emergency medical facility, and was therefore negligent as a matter of law. Accordingly, he submitted the case to the jury on the issues of proximate cause and damages. We note here that the City contends it was error to hold the City negligent

as a matter of law, and because it is a threshold issue, we will discuss this contention before proceeding to the issues raised by plaintiff.

The statute involved, section 80-2716(2), R.C.M.1947, now section 53-24-303 MCA, provides as follows:

"(2) A person who appears to be incapacitated by alcohol shall be taken into protective custody by the police and forthwith brought to an approved public treatment facility for emergency treatment. If no approved public treatment facility is readily available, he shall be taken to an emergency medical service customarily used for incapacitated persons. The police, in detaining the person and in taking him to an approved public treatment facility, is [sic] taking him into protective custody and shall make every reasonàble effort to protect his health and safety. In taking the person into protective custody, the detaining officer may take reasonable steps to protect himself. No entry or other record may be made to indicate that the person taken into custody under this section has been arrested or charged with a crime."

This statute became effective July 1, 1974 and plaintiff was injured on July 27, 1974; thus the statute was in effect on the day the police arrested the plaintiff and took him to jail.

In *Conway v. Monidah Trust* (1913), 47 Mont. 269, 132 P. 26, this Court adopted the general rule concerning the effect of a statutory violation. We stated:

" '. . . It is the general rule that where a statute makes a requirement or prohibits a thing for the benefit of a person or class of persons, one injured by reason of a violation of it is entitled to maintain an action against him by whose disobedience he has suffered injury; and this is true whether the statute is penal or not.' " 132 P. at 27.

The violation of a statute enacted for the protection of the public is negligence per se. *Daly v. Swift and Company* (1931), 90 Mont. 52, 300 P. 265. For this rule to apply, the plaintiff must be a member of the class in whose favor a duty was imposed by the statute, *Conway,* supra; and the defendant must be a member of

the class against whom a duty is imposed. *Williams v. Maley* (1967), 150 Mont. 261, 434 P.2d 398. Both requirements were fulfilled in this case.

The class of persons who have a duty imposed in their favor are those "who [appear] to be incapacitated by alcohol". And of course, the statute imposes the duty against "the police". The statute requires that the incapacitated person be "forthwith brought to an approved public treatment facility for emergency treatment . . ." The statute just as clearly provides the alternative duty imposed on the police: "If no approved public treatment facility is readily available, *he shall be taken to an emergency medical [facility] customarily used for incapacitated persons.*" (Emphasis added.) Section 80-2716(2), R.C.M.1947, now section 53-24-303 MCA.

▉ The arresting officers believed that plaintiff was intoxicated. When they booked him, he exhibited symptoms of intoxication and as a result, he was charged with public intoxication as well as with trespass. Moreover, his physical appearance was a clear signal of a need for medical treatment. Notwithstanding these facts, the police waited for sixteen hours before they took him to an emergency medical facility. By this time his condition had greatly deteriorated. Given these facts, we have no difficulty in determining that the City violated the statute and was therefore negligent as a matter of law.

But the City seeks to avoid application of this statute by a dual argument that the statute was not actually scheduled to take effect until January 1, 1976 and because no public treatment facility existed at the time plaintiff was arrested and taken to jail. The statute involved provides that the program outlined was not required to be fully implemented until January 1, 1976. The City's argument, however, ignores the intent of the legislation and of the alternative to taking plaintiff to a public treatment facility, namely, to an "emergency medical service customarily used for incapacitated persons", section 80-2716(2), supra.

The act establishes a legislative policy that alcoholism is to be

treated as a disease, not as a crime to be punished. Section 80-2701, R.C.M.1947, et seq., now section 53-24-101 MCA. The act initially charged the Department of Health and Environmental Sciences with the responsibility for establishing a statewide program for treatment of alcoholism as an illness. Sections 80-2711, 2712, R.C.M.1947, now 53-24-203(6) through (22), 53-24-207 MCA. But the legislature realized this could take time and therefore set a full implementation date of January 1, 1976, and required an interim report to the 1975 legislature. Section 80-2722, R.C.M.1947. Although all communities would not have alcohol treatment facilities by July 1, 1974, the legislature recognized that most communities at least had emergency medical services. Thus as of July 1, 1974, the police were required to take incapacitated persons to an emergency medical facility where such facility existed.

The Billings police customarily took incapacitated persons to St. Vincent's Hospital, and were doing so long before they arrested plaintiff. These circumstances demonstrate a clear violation of the statute. We note moreover that in the absence of the statute, the evidence would have justified the trial court in holding under common law principles that the City had violated its duty owed to plaintiff and was negligent as a matter of law.

The arresting officers asked plaintiff if he wanted to go to the hospital but he could only mumble and was unable to give a coherent reply. Sometime midway in the duration of his confinement at the jail, the police officers on duty recognized that plaintiff should be taken to the hospital, but ten more hours elapsed before he was finally taken there. The duty to obtain medical care for an inmate is illustrated by the case of *Dunham v. Village of Canisteo* (1952), 303 N.Y. 498, 104 N.E.2d 872.

In *Dunham*, village officials found plaintiff's decedent lying on a fire station floor mumbling incoherently and apparently in pain. They place him in jail where he remained for seventeen hours. During the course of his incarceration the village police officers recognized he was injured and needed medical attention, but took no immediate action. Sometime later they took him to a hospital,

but he died several days later. The Village of Canisteo was sued for negligence in causing his death. In granting a new trial to the deceased's personal representative the appellate court held that because the village assumed control over the deceased and he was unable to represent himself, the village's duty to exercise due care included a duty to obtain medical care for the deceased. This holding is consistent with the majority rule that law enforcement officials have a duty to obtain medical care when necessary for persons in their care or in their custody. *Thomas v. Williams* (1962), 105 Ga.App. 321, 124 S.E.2d 409, 413; *State ex rel. Morris v. National Surety Company* (1931), 162 Tenn. 547, 39 S.W.2d 581; Annot., 14 A.L.R.2d 353. The facts of the present case clearly establish that the City of Billings failed to discharge this common law duty owed to plaintiff.

The court therefore properly submitted only the issues of proximate causation and damages to the jury. Jury instructions become a factor in this appeal. Neither party questions the propriety of any instructions on the issue of damages. However, a brief summary of the major instructions regarding causation is helpful to an understanding of this case.

Concerning proximate cause the trial court instructed the jury that it was no defense to the City of Billings that another's negligence may have been a contributing cause to plaintiff's injuries. At *plaintiff's* request, the trial court also instructed the jury that if the defendant City contended that the injuries sustained by plaintiff were divisible, and therefore the damages apportionable, it was the burden of the City to prove the divisibility of injuries and resulting apportionment of damages. Also at *plaintiff's* request, the trial court instructed the jury that if there was no basis in the evidence to divide the injuries and thus the damages, that the jury must hold the City responsible to pay all of plaintiff's damages. Neither side in this appeal contends that these instructions were improper, but the instructions on divisibility of injuries and apportionment of damages become important in our analysis.

The plaintiff raises two issues concerning jury instructions,

and two issues concerning the propriety of testimony. The court, over plaintiff's objection, instructed the jury that plaintiff had settled with the bar owner for $10,000, and that if the jury returned a verdict for plaintiff it must deduct this $10,000 from the amount of the verdict. Plaintiff contends that this instruction nullified the effect of the order granting plaintiff's motion in limine prohibiting the jury from receiving this evidence. Plaintiff further contends that this error was compounded when the court, over plaintiff's objection, allowed the defendant City to call a police officer as its last witness who testified that the person who had assaulted plaintiff had pleaded guilty to the crime of assault and that he believed a fine was imposed. We agree with the plaintiff, and for these and other reasons we will discuss, determine that plaintiff was prejudiced by this instruction and testimony, and is entitled to a new trial. While we do not determine the remaining issues raised by plaintiff to be reversible error, we will discuss them as they may aid in the retrial of this case.

Plaintiff contends that prejudice was automatically injected into the trial when the jury learned that he had settled with James Mankin for $10,000 and that it must deduct this amount from its verdict if it found for the plaintiff. Plaintiff agrees that the $10,000 had to be deducted in any event but that the better procedure is for the court to deduct the amount of the settlement after the jury has returned with a verdict for plaintiff. While we agree with plaintiff's argument we also conclude that the instruction was error because it was an unconditional direction to the jury and therefore not a proper statement of the law when considered in connection with other instructions given to the jury on the question of divisibility of injuries and apportionment of damages.

█ We first discuss the propriety of disclosing the amount of the settlement to the jury. We have not ruled on this precise issue. In *Benner v. B. F. Goodrich* (1967), 150 Mont. 97, 430 P.2d 648, we recognized the basic rule that there must be a deduction in a case involving joint liability, but the issue was not whether the deduction should be made by the judge or jury. The preferable method is

to let the jury find total damages without disclosing the amount of the settlement to the jury, and thereafter the court, upon request of counsel, must deduct the amount of the settlement from the amount of the jury verdict. *Luth v. Rogers and Babler Construction Company* (Alaska 1973), 507 P.2d 761; *DeLude v. Rimek* (1953), 351 Ill. App. 466, 115 N.E.2d 561.

The court in *Luth* determined that prejudice to either party could arise by disclosing the amount of the settlement to the jury. It further reasoned that prejudice to either party could result because in the event of a verdict for the plaintiff the verdict (at least if it was a general verdict) would not disclose whether the jury had actually made the deduction. The amount of the settlement could adversely affect the defendant because there is a virtual admission of negligence by the settling party, and there is a danger that the jury will impute this negligence to the nonsettling defendant. On the other hand, if a settlement is disclosed to the jury, there is a danger that the jury may consider the settlement as evidence of total responsibility for the injury and of the defendant's freedom from fault. *Luth*, 507 P.2d at 768. In *DeLude*, the court reached similar conclusions. Also see *Burger v. VanSevern* (1963), 39 Ill.App.2d 205, 188 N.E.2d 373, 377 and *Degen v. Baymen* (1972), 86 S.D.598, 200 N.W.2d 134, 138. In *Degen*, the court unequivocally stated that it could "visualize no circumstances where the amount involved in a release or covenant need be disclosed to the jury". 200 N.W.2d at 139.

Implicit in these cases is the belief that there is too great a danger that the jury will be adversely influenced by extraneous factors which will creep into the jury's decision-making process. Such extraneous factors could well have affected the plaintiff in this case. Plaintiff asked for more than one million dollars in damages. Undisputed past damages to the time of trial were alone in excess of $60,000. Here the jury verdict was $20,000 ($30,000 if we conclude that the jury deducted the $10,000 settlement reached with the bar owner). This instruction telling the jury of the settlement directly contradicted the court order preventing the defendant

from injecting evidence of settlement into the trial record. By the court's instruction the defendant accomplished indirectly that which the court had ruled improper as evidence.

The instruction telling the jury of the $10,000 settlement also did not give the jury a true picture of the reason for the settlement in this amount. Plaintiff settled for this amount because it was the limit of the bar owner's insurance policy. The jury was operating therefore on incomplete information surrounding the reasons for the settlement. Had it been given complete information, another extraneous factor would have been injected into the trial because a true picture would have required the mention of insurance.

The testimony of the police officer added to the possible prejudice created by injecting the $10,000 settlement into the trial record. He testified that the person who had assaulted plaintiff had pled guilty to the assault and had possibly been fined. He did not testify from personal knowledge. This was obvious hearsay. Moreover, the jury was later instructed that it was no defense to the City that the negligence of another had contributed as a proximate cause to the injuries sustained by the plaintiff. However, the testimony of the police officer was that the person who had assaulted plaintiff had been convicted of the crime of assault. We have no way of assessing how the jury viewed this testimony in relation to the instruction on the contributory negligence of another and proximate cause. Conceivably the jury could have chosen to mitigate damages which the City owed because the plaintiff had settled for $10,000 from the person who had committed a crime against him. The jury could have concluded that the primary fault and responsibility should rest with the person who committed the crime of assault. The jury may well have asked why the plaintiff was willing to settle for $10,000 from the bar owner who had beaten him with a sap, while on the other hand he was seeking more than one million dollars from the City.

From a practical standpoint it is natural that in a situation such as this a jury will be curious as to why all potential defendants are not before the court where evidence is presented that more than

one person may be responsible for the resulting injuries and damages. In some situations perhaps a settlement has been reached with a person not then a defendant in the case; and in other cases perhaps a settlement has not been reached; or perhaps another person, for whatever reasons, has not been sued. Nonetheless, the trial court can tell the jury that it is to concern itself only with the issues before it and must not discuss or speculate why other persons are not also defendants in the action. The court can tell the jury that the court will take care of these factors at a later time after the jury has reached its verdict. Needless to say, a certain amount of discretion must be vested in the trial court so that each situation can be dealt with on a separate basis.

There will be times, however, when the jury should be informed of the amount of the settlement. Factual controversies surrounding a settlement may at times be germane to the issue. The most obvious example is the proper reapportionment of damages among several tortfeasors who have already been held at a separate trial, to be jointly and severally liable to a plaintiff. *Luth*, 507 P.2d at 768. Clearly, the amount paid by one or more of the joint tortfeasors has a direct bearing on the issue of apportionment of the total damages.

We next discuss why, in light of the instructions given to the jury on divisibility of injuries and the consequent possible apportionment of damages, it was error to direct that the jury deduct $10,000 from any verdict it found for the plaintiff. The instruction failed to distinguish a situation where a party may be held to be jointly and severally liable to a plaintiff from a situation where it may be determined that the damages may be apportioned between two or more parties because each is responsible for a portion of the injuries inflicted and the consequent damages. Deduction would be proper in the first instance of a determination of joint and several liability, but would be improper in the second instance of a determination of divisible injuries and therefore an apportionment of damages.

If liability is joint and several the plaintiff is entitled to only

one recovery. In that event deduction of an amount already paid by a joint tortfeasor is proper. *Black v. Martin* (1930), 88 Mont. 256, 292 P. 577; *Benner v. B. F. Goodrich, supra.* But if apportionment of damages applies, each defendant must pay his contribution to the whole, and therefore a deduction is not allowed for what another tortfeasor has paid. But the jury instruction in this case failed to distinguish between these situations. Regardless of whether the jury determined joint and several liability or determined that damages could be apportioned, the instruction flatly told the jury to deduct $10,000 from its verdict. This was error.

Informing the jury of the $10,000 settlement reached with the bar owner may have affected the verdict in another way. Assuming that the jury deducted the $10,000 before returning with its $20,000 verdict, we are still left with the question of why the jury determined that the City was responsible for $30,000 of the plaintiff's damages.

Under the instructions the jury had two options. First, it could determine that the City was liable jointly and severally, and therefore assess all of plaintiff's damages against the City. It is not likely, however, that the jury did so find because the verdict in the amount of $30,000 would clearly indicate that there was another basis for the jury's award. The proven and undisputed losses to plaintiff in medical expenses and lost wages up to the time of trial were alone in excess of $60,000. Moreover, there was no evidentiary basis from which the jury could conclude that the plaintiff would suffer no future damages. Thus, it is not probable that the jury determined damages on the basis of joint and several liability.

The other option under the instructions was to determine that the injuries to plaintiff were divisible and therefore that the damages were apportionable between the City and the other party responsible for the injuries. But how then is the $30,000 award explained? It is three times that of the settlement reached with the bar owner. Does this mean that the jury determined the City was responsible for seventy-five percent of the damages to plaintiff and that the bar owner was responsible for twenty-five percent of the damages to

plaintiff? If this is so, the $30,000 award cannot be reconciled with the evidence introduced on the question of damages. We note moreover that the City presented absolutely no evidence that the City was responsible for only a portion of the damages to plaintiff, and that the remainder could be attributed to the bar owner. As presented, the evidence allowed only for a determination of joint and several liability of the City or no liability at all.

We can only conclude that the $10,000 settlement with the bar owner prompted the jury, for reasons known only to the jury, to put an arbitrary lid on the amount which they determined the City should pay. Since the amount of the verdict was so low in comparison with even the proven and undisputed past losses, the prejudice to plaintiff is manifest.

We note that in a case involving potential joint and several liability, a defendant seeking to avoid such a determination has a distinct advantage if somehow he can introduce into evidence, or be the beneficiary of a jury instruction as was the case here, telling the jury the amount of the settlement which plaintiff has reached with another party. It may be difficult for a jury to accept that damages are nonapportionable if the jury is told in effect that the plaintiff has already extracted a sum certain in the form of a settlement from one of the persons who has caused him harm. A cautionary instruction may be to no avail.

Because it appears that jury instructions on the question of divisibility of injuries and apportionment of damages were given in a situation where there was no evidentiary basis in the record to justify such instructions, we feel it is necessary to discuss the relative duties of the parties and the court where questions arise between a determination of joint and several liability on the one hand and divisibility of injuries and apportionment of damages on the other.

As we have previously stated, there was no evidence justifying divisibility of injuries and apportionment of damages that was presented during the trial. Nonetheless, at *plaintiff's* request, the trial court instructed the jury that if there was a reasonable basis to

do so, the jury could divide the injuries and apportion the damages between those inflicted by the City and those inflicted by the bar owner. The court also instructed the jury at *plaintiff's* request that in the event the City contended that the injuries were divisible and the damages apportionable, it was the burden of the City to prove it. And the Court also instructed the jury that if "you find there is no reasonable factual basis upon which to apportion the harm and damages among those persons proximately causing them, then it is your duty to award to Plaintiff and against the city of Billings a verdict for the full amount of Plaintiff's damages".

Clearly, given the state of the evidence at the close of the case, the plaintiff should not have asked for these instructions and the court should not have given them. They directly benefited the City, yet there was no evidence in the record to justify giving them. Plaintiff's proof was simply that the negligence of the City was at least a contributing proximate cause of the plaintiff's permanent and total disability. The City countered by asserting that the sole proximate cause of the plaintiff's permanent total disability was the conduct of the bar owner in beating plaintiff with the sap. Neither party contended, at least neither party introduced evidence, that the injuries were divisible and the damages accordingly apportionable. But these instructions, notwithstanding the evidence, were an open invitation to the jury to find some way of apportioning damages. It is not unlikely under these circumstances that ingenious counsel could have made plausible arguments that apportionment was appropriate.

In *Black v. Martin* (1930), 88 Mont. 256, 292 P. 577, this Court recognized the basic rule that in a situation involving joint and several liability, a plaintiff can sue two or more defendants in one action or sue each of them in separate actions. In such situation the plaintiff may recover against one or all. The reason for the imposition of joint and several liability, as stated by Dean Wigmore, is so that the plaintiff will not be saddled with an unfair burden. Accordingly, the rule has its true place in application *"wherever the injured person has been injured by two or more persons* and cannot

prove the specific share of each." (Emphasis in original). Wigmore *Joint Tortfeasors and Severance of Damages*, 17 Ill.L.Rev. 458 (1923). He set forth the following as the proper application of the "single indivisible injury" rule:

*"Wherever two or more persons by culpable acts*, whether concerted or not, cause *a single general harm not obviously assignable in parts to the respective wrongdoers*, the *injured party may recover from each for the whole*. In short, wherever there is any doubt at all as to how much each caused, take the burden of proof off the innocent sufferer; make any one of them pay for the whole, and then let them do their own figuring among themselves as to what is the share of blame for each." 17 Ill.L.Rev. at 459 (Emphasis in original.)

■ Dean Prosser takes the same postiion. The true distinction between actions of multiple tortfeasors which result in imposition of joint liability and those which do not is between *injuries* which are divisible and those which are not divisible. Prosser, *Joint Torts and Several Liability*, 25 Cal.L.Rev. 413, 442; Prosser, *Law of Torts* (4th ed.) § 52, p. 316. Also see, Note, *Joint Torts and Several Liability*, 17 Tex.L.Rev. 399, 406. If there is no concert of action, the courts look at the combined effect of the tortious acts and determine if the combined result is divisible. If it is not divisible joint and several liability will be imposed. 17 Tex.L.Rev at 405; *Gilson v. Mitchell* (1974), 131 Ga.App. 321, 205 S.E.2d 421, 424.

Nondivisibility can result either because the harm caused cannot theoretically be divided or because plaintiff cannot practically divide it among the wrongdoers. For example, in the first instance death or the total destruction of a building would make the ultimate harm theoretically indivisible. In the second instance the harm may be theoretically divisible but it is single in a practical sense because plaintiff cannot practically divide it among the wrongdoers. Harper and James, *Law of Torts* (1956), § 10.1 pp. 701-702.

The indivisible injury rationale has been applied in several factual contexts. In *Maddux v. Donaldson* (1961), 362 Mich. 425, 108

N.W.2d 33, first the vehicle of one defendant struck plaintiff's vehicle and then the vehicle of another defendant struck plaintiff's vehicle. But the resulting injuries to plaintiff were not divisible and the court imposed joint and several liability. In a leading case involving pollution, Texas imposed joint and several liability where the pollution damages caused by two defendants could not be apportioned with reasonable certainty. *Landers v. East Texas Salt Water Disposal Company* (1952), 151 Tex. 251, 248 S.W.2d 731, 734. In Tennessee, in *Velsicol Chemical Corp. v. Rowe* (Tenn. 1976), 543 S.W.2d 337, 343, several companies emitted pollutants but the resulting harm caused could not be reasonably apportioned among the companies. The court imposed joint and several liability. In Georgia, the court imposed liability against two doctors where the tortious conduct of each occurred several days apart but where the conduct of each resulted in a single, indivisible injury. *Gilson*, supra. 205 S.E.2d at 427. The Fifth Circuit has applied joint and several liability to a products case involving strict liability where the resulting injuries could not be divided. *Higginbotham v. Ford Motor Company* (5th Cir. 1976), 540 F.2d 762.

The rule has been imposed in several other factual contexts. See *Michie v. Great Lakes Steel Division National Steel Corp.* (6th Cir. 1974), 495 F.2d 213; *Bowman v. Redding and Company* (1971), 145 U.S.App. D.C. 294, 449 F.2d 956; *Haft v. Lone Palm Hotel* (1970), 3 Cal.3d 756, 91 Cal.Rptr. 745, 478 P.2d 465; *Finnegan v. Royal Realty Company* (1950), 35 Cal.2d 409, 218 P.2d 17; *Summers v. Tice* (1948), 33 Cal.2d 80, 199 P.2d 1.

The "single indivisible injury" rule is not difficult conceptually but there seems to be considerable confusion as to application of this rule to a trial situation. Must the plaintiff bear the burden of showing or assigning injuries (and consequent apportionment of damages) to certain wrongdoers, or is that burden upon the defendants? If the reason for the rule is kept paramount, the burden of proof is on the defendant once the plaintiff has made a prima facie showing that the defendant's conduct contributed as a proximate cause to the harm suffered by plaintiff. *Cummings v. Kendall*

(1940), 41 Cal.App.2d 549, 107 P.2d 282; *Maddox v. Donaldson*, supra; *Mathews v. Mills* (1970), 288 Minn. 16, 178 N.W.2d 841; *Holtz v. Holder* (1966), 101 Ariz. 247, 418 P.2d 584.

In *Navigazione Libera T.S.A. v. Newtown Creek Towing Company* (2d Cir. 1938), 98 F.2d 694, 697, in discussing the "single indivisible injury rule" Judge Learned Hand concluded that the rule is "scarcely logical so long as the injured person has the burden of showing that the tortfeasor whom he pursues [has] caused the damage and how much he caused." Indeed, to impose upon the plaintiff the sometimes impossible burden of proving which tortious act did which harm, would be an expression of a judicial policy that it is better that a plaintiff, injured through no fault of his own, should take nothing simply because he could not prove which tortious act caused which harm. We believe on the other hand, that where the tortious act is established, it is better that the tortfeasor should be subject to paying more than his theoretical share of the damages in a situation where the tortious conduct has contributed to the confused situation making it difficult to prove which tortious act did the harm. *Maddox v. Donaldson*, 108 N.W.2d at 35. Indeed, since at least the year 1613, the proper application of this rule requires that if a defendant desires to avoid joint and several liability he must prove which tortious act did which harm and thus lay the foundation for the apportionment of damages. 17 Ill.L.Rev. at 458.

Where the harm caused is theoretically not divisible, such as in death or total destruction of a building, it is unlikely that a problem will arise at trial. In such cases the defendant either contributed as a proximate cause to death or to the total destruction of the building, or he did not. If he did, joint and several liability will be imposed. If he did not, of course, he would not be liable to pay any damages. But where the harm caused is theoretically divisible, plaintiff's burden is to make a prima facie showing that the harm caused was at least a contributing proximate result of the defendant's act or omission. The burden then shifts to the defendant to *either* deny all liability *or* to prove that the harm caused can be

divided and the damages therefore apportioned. Harper and James, *Law of Torts*, § 10.1, p. 704. Needless to say, the trial judge has a critical function in assessing the evidence at the end of the case before he instructs the jury.

Because there are dangers that a jury may make arbitrary and speculative divisions of damages (that is, without an evidentiary basis in the record) in situations where the acts or omissions of a number of defendants have combined to produce a single injury, it is important that the trial judge carefully assess the state of the evidence before submitting the case to the jury. See, *Waterway Terminals Company v. P. S. Lord Mechanical Contr.* (1970), 256 Or. 361, 474 P.2d 309; *Schomer v. Madigan* (1970), 120 Ill.App.2d 107, 255 N.E.2d 620.

If the evidence is such that the harm can with reasonable certainty be divided among several causes, the court must instruct the jury that it is their duty to apportion the damages. On the other hand, if the record can not, with reasonable certainty, support divisibility of harm, the trial court must instruct the jury to find one award of total damages for which the defendant or defendants are jointly and severally liable, should their acts be found to be the proximate cause of the harm. The court may also determine that the evidentiary record is such that a jury may reasonably differ as to divisibility of harm. In that event the court must instruct the jury that it may if able to do so, divide the harm and therefore apportion the damages. But he should also instruct the jury that it may also conclude that the harm caused is not divisible and accordingly that it may award a verdict for which the defendant or defendants are jointly and severally liable. See Restatement (Second) of Torts § 434, comment (c) and (d).

We now turn to discuss several issues which are not determinative of this appeal, but which may be helpful in the retrial of this case.

The defendant's medical expert, Dr. Hitselberger, in giving an opinion, relied in part on a police report detailing the incident in question. Plaintiff contends this was error. Moreover, the doctor

rendered many opinions throughout this testimony without first prefacing or appending the statement that it was based on reasonable medical certainty. Plaintiff contends this procedure improperly allowed the doctor to testify to an "umbrella standard" rather than to "reasonable medical certainty." We do not agree with plaintiff on either point.

 The police report which included hearsay, does not by itself prevent an expert from relying on it as part of the basis for his opinion. We, as well as other courts and commentators, have recognized that experts in all fields often must base their opinion testimony on hearsay evidence. *Hunsaker v. Bozeman Deaconess Foundation* (1978), 179 Mont. 305, 588 P.2d 493, 504-505; *United States v. Sims* (9th Cir. 1975), 514 F.2d 147; *E. D. Wesley Co. v. City of New Berlin* (1974), 62 Wis.2d 668, 215 N.W.2d 657; Comment, 53 Tex.L.Rev. 296 (1974); Comment, 35 So.Cal.L.Rev. 193 (1962), McCormick *Evidence* (2d ed. 1972), § 15, p. 34. As the court in *Sims* stated:

"The rationale in favor of the admissibility of expert testimony based on hearsay is that the expert is fully capable of judging for himself what is or is not a reliable basis for his opinion. This relates directly to one of the functions of the expert witness; namely to lend his special expertise to the issue before him. In so doing, various experts customarily rely on evidence not independently admissible in the courtroom . . . In a sense, the expert synthesizes the primary source material—be it hearsay or not—into properly admissible evidence in opinion form. The trier of fact is then capable of judging the credibility of the witness as it would that of anyone else giving expert testimony. *This rule respects the functions and abilities of both the expert witness and the trier of fact while assuring that the requirement of witness confrontation is fulfilled.*" 514 F.2d at 149. (Emphasis added.)

We note, moreover, that Rule 703 of the new Rules of Evidence in this State, is consistent with the view stated in *Sims*. While this case was tried before the new rules went into effect, we see nothing in decisions before the adoption of the new rules that would dictate

a different conclusion from what we reach here. Of course, the retrial of this case will be governed by the new Rules of Evidence.

Questions probing the basis or the source of the information used to form an opinion go to the weight to be accorded to the opinion and not to its admissibility. *Hunsaker*, supra. Here plaintiff's counsel had every opportunity to cross-examine the doctor and explore the underlying foundation for his opinion. Moreover, pretrial discovery was available to the plaintiff to determine the underlying foundation for the doctor's opinion.

Nor do we accept the plaintiff's contention that the words "resonable medical certainty", must preface or be appended to every statement of opinion rendered by a medical expert. In *Stordahl v. Rush Implement Company* (1966), 148 Mont. 13, 417 P.2d 95, this Court determined that there is no particular standard of strictness required so long as it is "determined that [the] testimony encompasses a reasonable degree of medical [testimony]." 417 P.2d at 99. In *Farris v. Clark* (1971), 158 Mont. 33, 487, P.2d 1307, 1313, this Court determined that "the sum total of the [medical] testimony must contain a degree of medical certainty." We concluded that it is the context and circumstances of the testimony that is important, and not the mere form of the answer. We note, moreover, that the trial court specifically instructed this medical witness at the outset of his testimony, that he was subject to the rule requiring "reasonable medical certainty."

The last issue raised by plaintiff concerns the propriety of setting forth the verbatim words of a statute as a jury instruction. In the first paragraph of the instruction, the court set forth the verbatim words of section 80-2716(2), R.C.M.1947, now section 53-24-303 MCA. In the second paragraph of the same instruction, the court instructed the jury that it had ruled as a matter of law that the defendant City was negligent in violating this statute. In the third paragraph of the same instruction, the court told the jury that although negligence was established as a matter of law, the jury must also find that the negligence was the proximate cause of the injuries suffered by the plaintiff.

Plaintiff argues that the verbatim words of the statute should not have been given to the jury because it allowed the jury to again consider the issue of whether the defendant City was negligent. We cannot accept this argument, and see no reversible error under the facts of this case. We note, however, that in the normal case, the jury should not be instructed in the precise words of the statute. Rather, it is the duty of the court to interpret the meaning and requirements of a statute, and then to frame an instruction expressing in clear and concise language, the meaning of the statute.

It may be for example, that a statute requires an interpretation as to meaning. It is not for the jury to supply that interpretation. That is the function of the trial court. Both counsel, however, have a duty to aid the court in framing an appropriate instruction setting forth the substance and meaning of the statute. Only then can we state that the court has fulfilled its duty to fairly instruct the jury on the law. In *Hunsaker*, we stated that verbatim language from cases of this or other jurisdictions should not normally be used as jury instructions. 588 P.2d at 509. What we said there applies equally to statutes. Statutes are not intended as or designed to be jury instructions.

The final matter to be disposed of in this appeal is the scope of the trial on remand. Plaintiff has asked that in the event we remand for a new trial, we limit the trial solely to the issue of damages. This is based on the jury award already assessed against the defendant in the amount of $20,000—the plaintiff thus arguing that liability has been clearly and convincingly established, and therefore there is no need for a retrial on that issue. This trial however, involved the application (or misapplication) of relatively complex rules of law. The respective burdens of the plaintiff and the defendant, together with the duties of the trial court, were not fully appreciated. Under these circumstances it would be unfair to saddle the defendant with liability before the rules had been properly applied to the trial of the case. We believe, therefore, that justice will be better served by a retrial on the issue of liability and damages.

258

The judgment is vacated and the cause remanded for a new trial.

MR. JUSTICES DALY and HARRISON and PETER MELOY, District Judge, sitting in for Mr. Justice Sheehy, concur.

MR. CHIEF JUSTICE HASWELL specially concurring.

I concur in the result on the ground that the verdict is not supported by the evidence. I concur with the majority that there is no evidence supporting an apportionment of plaintiff's total damages between the City of Billings and bar owner Mankin. Accordingly, plaintiff is entitled to recover the full amount of his damages from the City of Billings less the $10,000 previously paid by Mankin. As the uncontradicted evidence shows that plaintiff's special damages alone exceeded $60,000, a verdict of only $20,000 is clearly inadequate and not supported by the evidence.

My quarrel with the majority opinion lies in some of the broad and sweeping statements made therein under the guise of preventing error on retrial. I fear that some of these statements may be cited as authority and precedent in future cases to support reversals of jury verdicts on highly technical grounds.

For example, the majority state that in the normal case the jury should not be instructed in the precise words of the statute, but rather the trial court should interpret the meaning and requirements of the statute and then frame an instruction expressing in clear and concise language the meaning of the statute. Although expressing a commendable ideal, this statement conceals a potential for mischief that far exceeds the problem it is intended to correct.

The implication of this statement is that in the usual case it is the duty of the trial court to improve the statutory language enacted by the legislature. Thus, where the trial court fails to paraphrase a statute in instructing the jury on the law of the case, the seeds of reversal of jury verdicts are sown. I disagree with this rigid, inflexible approach.

In my view, jury instructions should be tested on appeal by the standard of whether they fairly and correctly state the law of the

case rather than whether some alternative language would be better or worse than the trial court's instruction.